THE SUPERIOR OIL COMPANY V. LEWIS M. DABNEY, JR., ET AL.

No. A1463. Decided April 21, 1948.
Rehearing overruled June 16, 1848.
(211 S. W., 2d Series, 563.)

*Jacques P. Adoue, Williard B. Wagner, Jesse L. Lee* and *Williams, Lee, Kennerly & Cameron,* all of Houston, for petitioner.

It was error for the Court of Civil Appeals to hold that the two instruments comprised the lease contract and then failing to construe them together, but on the contrary, construed each one separate and independent of the other, holding that the unrecorded instrument was merely supplemental to the other. Also in holding that petitioner's lease executed and delivered to respondent did not relieve it from drilling the well, notwithstanding the release provision in the lease contract. Guardian Trust Company v. Baureisen, 132 Texas 404, 121 S. W. (2d) 583; Perry v. Langbehn, 113 Texas 72, 79, 252 S. W. 474; Guadalupe-Blanco River Authority v. City of San Antonio (on rehearing) 145 Texas 631, 200 S. W. (2d) 1002.

*Hutcheson, Taliaferro & Hutcheson* and *Palmer Hutcheson,* all of Houston, for respondents.

In reply to the propositions of petitioner, cited: State v. Stanolind Oil & Gas Co., 190 S. W. (2d) 510; Cowden v. Broderick & Calvert, 131 Texas 434, 114 S. W. (2d) 1166; Hefner v. Light, Power & Fuel Co., 77 W. Va. 217, 87 S. E. 206.

MR. JUSTICE SIMPSON delivered the opinion of the Court.

An oil, gas and mineral lease was entered into between J. C. Hutcheson, Jr., and others as lessors and The Superior Oil Company as lessee on December 20, 1941, covering the undivided interest of the lessors in 769 acres, more or less, known as the James Ross Survey in Montgomery County, Texas. The lease was for a primary term of five years and provided for certain royalties in kind and an overriding payment out of production. It also contained the following provision: "Lessee may at any time execute and deliver to Lessor or to the depository above named or place of record a release or releases covering any

portion o*f* portions of the above describe dpremises and thereby surrender this lease as to such portion or portions and be relieved of all obligations as to the acreage surrendered."

The lessee paid lessors a cash consideration of $42,642.84 upon the delivery of the lease.

Contemporaneously with the execution of the oil, gas and mineral lease, which was filed for record in Montgomery County, the same parties, for their mutual benefit and to maintain privacy of contract, entered into a written agreement to which the lease was attached as an exhibit and which was not placed of record. This agreement obligated the lessee "to commence operations for the drilling of a well in search of oil or gas" on the leased premises on or before the expiration of sixty days after either (a) the reaching of an agreement locating the eastern boundary of the James Ross Survey where the lessors claimed it was, or (b) the rendition of a final judgment settling the boundary line in keeping with the lessors' claim. Such a judgment was obtained and became final on July 10, 1946. Shortly afterwards, the lessee delivered to the lessors a release of oil, gas and mineral lease which purported to surrender all portions of the leased premises except 17.997 acres. This release, dated July 12, 1946, was executed in behalf of the lessee and provide blank spaces for its execution by the lessors, who, however, declined to sign it. In a letter to the lessee dated August 12, 1946, they took the position that within sixty days after the judgment became final the lessee was under a "positive and unequivocal obligation" to drill on the leased premises in search for oil or gas, and demanded that the lessee begin drilling operations. The lessee refused, and this, a declaratory judgment suit, was brought by lessors, who sought to have it decreed that the lessee was under a "legal obligation" to drill the well in question. The district court so decreed, and its judgment was affirmed by the Court of Civil Appeals. 204 S. W. (2d) 681.

Pooling and unit operating agreements had been executed by lessor, the lessee, and numerous other parties effective November 16, 1942. These agreements in general provided for the unitization of the leasehold estates covering all of eleven surveys, including the Ross, and portions of eight others, for the purpose of searching for, producing, processing, recycling, and, generally, beneficially handling liquid and gaseous hydrocarbons found in the unitized area, which had been proved to include gas and condensate bearing formations. No well had been drilled

on the 17.997 acres of the Ross Survey which was excepted from the release executed by the lessee, but an advisory committee set up under the provisions of the pooling agreement had included this tract in a so-called "participating area" and, consequently, the leasehold estate as to the 17.997 acres had been and would be continued in force so long as "unitized substances" were produced from any part of that area.

The effect of these pooling and unitizing agreements upon the rights of the parties is the subject of extended briefing and interesting and able arguments. However, an analysis of those agreements become unnecessary in view of the controlling effect which must in law be given to the provision of the lease which stipulates that it may be surrendered at any time.

This lease and the contemporaneous drilling agreement comprised one contract. Indeed, the drilling contract expressly makes the lease a part of it. The two instruments must be construed, not as two dissociated agreements, but as a single integrated engagement. Guardian Trust Co. v. Bauereisen, 132 Texas 396, 121 S. W. (2d) 579; Veal v. Thomason, 138 Texas 341, 159 S. W. (2d) 472.

The lease and accompanying contract not only provided that the lessee should drill upon the happening of the contingency stated, but also that: "In the event operations for drilling are not commenced on said land on or before one year from this date Lessee shall pay to Lessors or said Agents and Attorneys in Fact, as an advance on, and to be credited against, said overriding payment from production, the sum of $10.00 per acre." Like provision was made for subsequent years.

It will thus be seen that the lease was not to terminate automatically if the lessee should fail to drill or pay. Rather, the lessee was bound to do the one or the other. These obligations, as well as the covenant to drill a test well, might obviously prove quite onerous and profitless to the lessee, should developments demonstrate that the land would not yield oil or gas in paying quantities. And unless it took the pains to contract against this outturn, the lessee might find itself absolutely obliged to go forward with a fruitless and costly undertaking. But the parties did provide against this eventuality. In very plain language they agreed that the lessee might *at any time* execute and deliver to the lessor a release of any part of the leased premises and "thereby surrender this lease as to such portion or portions and be relieved *of all obligations as to the acreage surrendered."* (Emphasis supplied.)

This provision did not state in effect "all obligations except the duty to drill a test well," but in comprehensive language declared that a surrender would relieve the lessee of *all obligations*. None was excepted. This language must be given an operative effect in harmony with its plain import and must be held to grant to the lessee the right to release any part of the land covered by the lease and be relieved of the duty to drill on the surrenderd acreage.

■ It has been settled law in Texas since the decision of Corsicana Petroleum Co. v. Owens, 110 Texas 568, 222 S. W. 154, that a lease is not invalid merely because it contains a clause providing for its surrender. In that case, a clause giving the lessee "the right or option to surrender the lease by paying the sum of $5.00 and all other amounts due under it up to that time" was upheld. In the case at bar, no new consideration for the right to surrender need have been paid, because the down payment was expressly declared, in the language of the lease, to be the "consideration for this lease according to its terms." The absolute right to surrender was one of the privileges the lessee paid such a substantial consideration to acquire. In Patton v. Texas Pac. Coal & Oil Co. (Tex. Civ. App.) 225 S. W. 857, 858, affirmed on this point but reversed upon another (Tex. Com. App.) 238 S. W. 202, the precise question of whether the original consideration would support the option given a lessee to surrender was presented. The Court of Civil Appeals said: "The lease being executed for an independent and valuable consideration, to wit, $621.50, and for a definite period of five years, we hold that it is not void because unilateral or for want of mutuality whether the right granted therein is an option or an interest in land, and regardless of the lessee's right to surrender. (Citing authorities.) It appears from the instrument itself that the $621.50 down paid was sufficient consideration, and was so intended, to support the contract, including the right of the lessee to surrender."

Options to surrender in contracts of lease are now regarded as valid by a practical unanimity of decision. Rhoads Drilling Co. v. Allred, 123 Texas 229, 70 S. W. (2d) 576; Guffey v. Smith, 237 U. S. 101, 35 Sup. Ct. 526, 59 L. Ed. 856; Cleveland Wrecking Co. v. Aetna Oil Co., 287 Ky. 542, 154 S. W. (2d) 31, 137 A. L. R. 352 (and the cases collected at pp. 377-378). To this the text writers also agree. Thuss, Texas Oil and Gas (2d ed.) secs. 67, 90; I Thornton, Law of Oil and Gas (5th ed.) secs. 101, 101a; III Summers, Oil and Gas (permanent ed.) sec. 522.

It follows that the option to surrender in the lease and contract here involved must be held valid and given effect.

The Corsicana Petroleum Co. v. Owens case announced that the duty rested upon the lessee to pay all amounts due up to the time of surrender. If it be agreed that the lessee here could not surrender itself, so to speak, out of a duty to pay amounts already due or execute obligations the time for performance of which had come and gone, it is to be observed that when the release was tendered lessor's, the lessee's obligation to drill a test well was still prospective in that it was performable at any time within sixty days from July 10, 1946. The release was dated July 12, 1946, and was delivered to lessors before the lessee was or could have been in default as to its duty to drill. And since there was no such default at the time the release was delivered, the lessee was privileged under the agreement of lease to surrender it and be relieved of all further obligations, including the duty to drill.

It is appropriate to observe tht there were other obligations in the lease and contract besides the one requiring a test well. Among them was the obligation, which has been noted, requiring the lessee unequivocally and absolutely either to drill on the lease or pay advance royalties from year to year during the primary term. The duty devolved upon the lessee, for instance, immediately after the delivery of the lease to drill or pay on or before the end of the year. It might wait until the very last of the year to begin drilling or to pay, and not in the meantime be in default. And if *at any time* before the expiration of the year the lessee had concluded to release the lease, it could not be plausibly argued that it did not have  the right to release and be relieved of the obligations the lease imposed upon it. And so from year to year during the primary term. This covenant to drill or pay is not essentially different from the obligation to drill the test well. All were express covenants, but the duty to perform them all alike could be effectively terminated by a timely release.

The release of July 12, 1946, was properly executed by the lessee and tendered to the lessors. Spaces for the signature of the lessors were provided at the end of the instrument. As has been stated, the lessors declined to sign. These circumstances do not at all deprive the instrument of its effectiveness as a release. All that was required under the wording of the lease was that the lessee execute and deliver a release to the lessors. This was done, and thereupon the release became fully effective.

It follows that the judgments of the district court and Court of Civil Appeals must be reversed and judgment here rendered for the lessee.

Opinion delivered April 21, 1948.

Rehearing overruled June 16, 1948.