C. Trebes SASSER, John B. Stevenson, Jr., and James F. Hill, Appellants,

v.

DANTEX OIL & GAS, INC., Kinlaw Oil Corp., and Scurlock Permian Corp., Appellees.

No. 04–94–00095–CV.

Court of Appeals of Texas, San Antonio.

Aug. 23, 1995.

Kevin M. Beiter, Margaret P. Sullivan, Cox & Smith Incorporated, San Antonio, for appellants.

Ivan D. Hafley, Camp Wood, Jane E. Dillinger, Mankoff, Hill, Held & Goldburg, Dallas, James D. Thompson, III, Dana C. Livingston, Vinson & Elkins, L.L.P., Houston, for appellees.

Before LOPEZ, STONE and DUNCAN, JJ.

DUNCAN, Justice.

We grant appellants' motion for rehearing and substitute this opinion in place of the original.

Appellants, C. Trebes Sasser, John B. Stevenson, Jr., and James F. Hill, overriding royalty interest owners under a 1974 oil and

gas lease, appeal the summary judgment granted in favor of appellees—Dantex Oil & Gas, Inc., the ultimate lessee under the 1974 Lease and the initial lessee under a 1990 lease covering the same acreage; Kinlaw Oil Corp., the ultimate lessee under the 1990 Lease; and Scurlock Permian Corp., the purchaser of the oil produced under the 1990 Lease. For convenience, we will refer to all appellants as "Sasser."

Sasser attacks the summary judgment on two specific grounds.[1] First, Sasser contends that the 1990 Lease was ineffective to release the 1974 Lease and, therefore, to extinguish his overriding royalty interest under the 1974 Lease because Dantex failed to strictly comply with the 1974 Lease's surrender clause. In the alternative, Sasser argues that the trial court erred in concluding that Dantex did not owe him a duty of good faith and fair dealing or any other fiduciary-type duty. We reject both arguments and affirm the judgment.

## FACTS

In 1974, Leo and Emma Newsom granted to Reagan Houston, Jr. an oil and gas lease for a primary term of three years and, "[s]ubject to the other provisions [of the 1974 Lease], as long thereafter as oil, gas, or other mineral is produced...." One of the "other provisions" in the 1974 Lease was a unilateral surrender clause: The lessee could "at any time or times execute and deliver to [Newsom] or to [Security State Bank] or place of record a release or releases of this lease as to all or any part of the above-described premises ..., and thereby be relieved of all obligations as to the released land or interest."

Ultimately, Dantex acquired 75% of the working interest and Sasser acquired all of the overriding royalty interest in the 1974 Lease. As Sasser admits, the instruments creating his overriding royalty interest conveyed a fixed percentage of the oil and gas produced "by virtue of the terms from the particular lease" and did not purport to extend to renewals, extensions, or modifications of the 1974 Lease.

By 1990, there were only three producing vertical wells on Newsom's property. That summer Newsom told Tom Morris, Dantex's landman, that the 1974 Lease had expired because the production was not in paying quantities. Dantex was also concerned about this possibility and, therefore, directed Morris to ask Newsom to ratify the 1974 Lease. Newsom refused; he wanted both a larger royalty and a requirement that the lessee drill a horizontal well to increase production. Although Dantex was willing to drill a horizontal well, it estimated that the cost to do so would be more than $1 million, and it wanted the assurance of an unquestionably viable lease before it committed to the expense. Following negotiations with Newsom's attorney, the parties entered the 1990 Lease. The 1990 Lease contained a royalty term more favorable to Newsom and expressly recognized that "a portion of the consideration to Lessor for this lease is the drilling by Lessee of a 'horizontal' well.... Failure to commence operations for the drilling of a 'horizontal' well during the primary term hereof shall cause this lease to terminate at the end of such primary term and such termination shall release Lessee from any further liability regarding such 'horizontal' well."

Dantex sold the 1990 Lease to Kinlaw, which thereafter drilled several horizontal wells. In 1992 Sasser filed suit against Dantex, Kinlaw, and Scurlock. Sasser sought a declaratory judgment establishing that his overriding royalty interest burdened the 1990 Lease, an accounting and a money judgment for the royalties alleged to be due, and attorney's fees. Alternatively, Sasser alleged that, by entering the 1990 Lease, Dantex wrongly attempted to eliminate or "washout" Sasser's overriding royalty interest, thereby breaching its duty of good faith and fair dealing or other fiduciary-type duty.

Dantex moved for summary judgment as to Sasser's declaratory judgment action and his claim for breach of a duty of good faith and fair dealing. As to Sasser's declaratory judgment action, Dantex's motion stated

---

1. *See Malooly Bros., Inc. v. Napier,* 461 S.W.2d 119 (Tex.1970); *see generally* TIMOTHY PATTON, TEX-AS SUMMARY JUDGMENTS § 8.03[1] (Butterworth 1994 ed.) (court of appeals may reverse summary judgment only upon grounds encompassed by points of error and briefing thereunder).

that, although Sasser alleged that his overriding royalty interest under the 1974 Lease was "not extinguished when a new Oil and Gas Lease was executed in 1990," Dantex's summary judgment proof and applicable authorities demonstrated that "the 1974 Oil, Gas and Mineral Lease, out of which [Sasser's] overriding royalty interest[ ] [was] carved, terminated, in 1990" and Sasser's "claimed overriding royalty interest[ ] [was] simultaneously extinguished, as a matter of law." Dantex supported its motion with the affidavits of Newsom, Morris, John D. Stelzer, its Vice President–Finance, and G.R. Tippens, its Vice President–Land & Exploration. Newsom's affidavit stated that he "understood that by agreeing to the new lease, Dantex was releasing the old, 1974, oil and gas lease...." Likewise, Morris' affidavit stated that, during the negotiations leading up to the 1990 Lease, "it was understood that the execution of a new oil and gas lease between [Newsom] and Dantex would amount to a release by Dantex of the existing [1974] Lease." Newsom, Stelzer, and Tippens further stated in their affidavits that, in their opinion, the 1974 Lease was not producing in paying quantities and had terminated at least by the end of October 1990. Dantex also argued that it was entitled to summary judgment as to Sasser's good faith and fair dealing claim because Dantex owed no such duty to Sasser.

In response, Sasser apparently took the view that Dantex's motion was based upon the theory that the 1974 Lease terminated only because there was not production in paying quantities. Sasser's written response thus did not address Dantex's theory that the 1990 Lease terminated Sasser's overriding royalty interest—irrespective of whether there was production in paying quantities prior to its execution. Specifically, Sasser's response alleged that "material issues of fact exist regarding whether there was production in paying quantities at the time the [1990] Lease was taken," as well as "whether a reasonably prudent operator would have continued operations." In support, Sasser tendered the affidavit of James F. Hill, which refuted Dantex's proof that the 1974 Lease was not producing in paying quantities. Sasser also countered that Dantex owed him a

duty of good faith and fair dealing, and Dantex breached this duty by entering the 1990 Lease. To support his response in this respect, Sasser tendered copies of Texas Railroad Commission forms, excerpts from Tippens' deposition, and interrogatory answers.

The trial court granted Dantex's motion, finding that the uncontroverted summary judgment proof established that the execution of the 1990 Lease by Dantex and Newsom constituted a tacit release of the 1974 Lease, such that Sasser's overriding royalty interest was extinguished. The trial court further found that the uncontroverted summary judgment proof established that the relationship between Dantex and Sasser was a purely business relationship, and there was no evidence of any special relationship. In the absence of a special relationship, the trial court reasoned that Dantex did not owe Sasser any duty of good faith and fair dealing or any other fiduciary-type duty. Sasser subsequently added additional claims against Dantex for breach of implied covenants. These claims, however, were severed from Sasser's original claims, thus rendering the trial court's partial summary judgment final.

Sasser brings two points of error. First, Sasser argues that the trial court erred in concluding that the 1990 Lease effected a release of the 1974 Lease. Second, Sasser argues that the trial court erred in concluding that Dantex did not owe him a duty of good faith and fair dealing or any other fiduciary-type duty.

## STANDARD OF REVIEW

We review a summary judgment de novo. Accordingly, a summary judgment will be upheld only when the movant establishes that there is no genuine issue of material fact and she is entitled to judgment as a matter of law. TEX.R.CIV.P. 166a(c); *Nixon v. Mr. Property Mgt. Co.*, 690 S.W.2d 546, 548–49 (Tex.1985). In deciding whether the summary judgment proof presents a disputed issue of material fact, we view as true the evidence favorable to the non-movant and indulge every reasonable inference and resolve all doubts in his favor. *Nixon*, 690 S.W.2d at 548–49.

## RELEASE [2]

■ The parties agree that an effective release of an oil and gas lease extinguishes an overriding royalty interest unless the instrument creating the overriding royalty interest expressly provides to the contrary. *Sunac Petroleum Corp. v. Parkes*, 416 S.W.2d 798, 804 (Tex.1967); *Fain & McGaha v. Biesel*, 331 S.W.2d 346, 347–48 (Tex.Civ. App.—Fort Worth 1960, writ ref'd n.r.e.) (following *Keese v. Continental Pipe Line Co.*, 235 F.2d 386, 388 (5th Cir.1956) (applying Texas law)); *see also Keese*, 235 F.2d at 388 n. 3 (collecting Texas cases). As noted above, the instruments creating Sasser's overriding royalty interest expressly provided that his royalty interest attached only to the 1974 Lease. Accordingly, the primary dispute in this appeal is whether the 1974 Lease was effectively released. Dantex argues, and the trial court ruled, that simply entering the 1990 Lease, with the mutual intent of terminating the 1974 Lease, effectively released the 1974 Lease and terminated Sasser's overriding royalty interest. Sasser, on the other hand, insists in his first point of error that the 1974 Lease was not effectively released because Dantex did not strictly comply with the 1974 Lease's surrender clause by giving Newsom a written release.

■ Forfeiture clauses are for the benefit of, and may be invoked or waived by, the lessor. *Berry v. Kelly*, 90 Cal.App.2d 486, 203 P.2d 80, 82 (1949). Waiver results as a legal consequence of an act or conduct of a party against whom the doctrine operates. *United States Fidelity & Guar. Co. v. Bimco Iron & Metal Corp.*, 464 S.W.2d 353, 357–58 (Tex.1971). We believe and hold that, by signing a new lease with the intent to terminate a prior lease, a lessor waives strict compliance with a surrender clause and effectively terminates or releases the prior lease. *See Shell Oil Co. v. Stansbury*, 401 S.W.2d 623 (Tex.Civ.App.—Beaumont 1966),

writ ref'd n.r.e., 410 S.W.2d 187 (Tex.1966) (per curiam) (recognizing that lessor and lessee can effect limited release by "mutual agreement").

Sasser's argument that Dantex was required to strictly comply with the 1974 Lease's surrender clause rests upon *Stansbury, supra,* and *Superior Oil Co. v. Dabney*, 147 Tex. 51, 211 S.W.2d 563 (Tex.1948). We believe Sasser's reliance is misplaced. In both *Dabney* and *Stansbury*, the lessor actively sought to maintain the lease over the lessee's attempted surrender. That is not the case here. Newsom, unlike the lessors in *Dabney* and *Stansbury*, refused to ratify the existing lease and instead, with the intent and desire of terminating the existing lease, entered into a new lease on terms more favorable to him. This conduct, coupled with the parties' intent to effect a termination, terminated or released the 1974 Lease as a matter of law.

■ When viewed in light of applicable law, Dantex's motion and proof conclusively establish that the 1974 Lease terminated when Dantex and Newsom signed the 1990 Lease with the intent and understanding that, by doing so, they would effect a release of the 1974 Lease. Dantex's motion and proof were thus legally sufficient to support a judgment in Dantex's favor on Sasser's declaratory judgment action; therefore, the burden shifted to Sasser to point out to the trial court in a written response why a summary judgment on this claim should be denied. TEX.R.CIV.P. 166a(c); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex.1979); *see generally* TIMOTHY PATTON, TEXAS SUMMARY JUDGMENTS §§ 4.01–.02 (Butterworth 1994 ed.).

In his written response, Sasser raised only one ground for denying Dantex's motion on his declaratory judgment action: a material issue of fact existed regarding whether the 1974 Lease had terminated due to a lack of

---

2. In his motion for rehearing, Sasser insists that we may not affirm the summary judgment on a release theory because the motion was grounded "only [upon] the purported termination of the Lease due to a failure to produce oil and gas in paying quantities." *See McConnell v. Southside I.S.D.*, 858 S.W.2d 337, 342–43 (Tex.1993). We disagree. As the excerpts from Dantex's motion

quoted above demonstrate, Dantex adequately apprised Sasser and the trial court that Dantex was moving for summary judgment on the ground that the 1974 Lease was terminated by virtue of the 1990 Lease. Indeed, Dantex's supporting affidavits specifically used the word "release."

production in paying quantities. In this court, Dantex has conceded that Sasser raised this fact issue, and we have assumed for purposes of our discussion that there was production in paying quantities. This fact, however, is not material; Dantex and Newsom effected a release of the 1974 Lease by signing the 1990 Lease—regardless of whether there was production in paying quantities.

■ In this court, Sasser also argues that the summary judgment proof raises material fact issues as to Newsom and Dantex's intent to release the 1974 Lease. For instance, Sasser contends that Newsom's deposition testimony establishes that Newsom did not know at the time he signed the 1990 Lease that Dantex owned the majority working interest and operated the wells drilled under the 1974 Lease. We agree that the summary judgment proof establishes this fact. We disagree, however, that Sasser has preserved this argument. *See, e.g., Clear Creek Basin Auth.,* 589 S.W.2d at 678–79. Moreover, even if this issue had been preserved, it would not preclude a summary judgment on Sasser's declaratory judgment action. Only genuine issues of material fact preclude summary judgment. *See* TEX.R.CIV.P. 166a(c); *e.g., Nixon,* 690 S.W.2d at 548–49; TEXAS SUMMARY JUDGMENTS at § 4.02. n. 16 & accompanying text. Whether Newsom knew the identity of the lessee under the 1974 Lease is immaterial; it does not alter the fact, also established in Newsom's deposition, that Newsom thought the land "was leased, under lease; but it wasn't paying anything, and [Newsom would] like to get rid of it and get a new lease." The other issues of fact Sasser argues for the first time in this court are likewise immaterial.[3] Even if we assume their truth, as we must in reviewing a sum-

mary judgment, these facts do not alter the material and dispositive facts—both Dantex and Newsom desired and intended to terminate the 1974 Lease by signing the 1990 Lease if termination had not already been accomplished by virtue of the lack of production in paying quantities, and both Dantex and Newsom signed the 1990 Lease with that understanding. These are the material facts, and the basis for our holding that, as a matter of law, by signing the 1990 Lease, Newsom and Dantex terminated the 1974 Lease.

■ Sasser also argues that Newsom and Dantex's tacit release of the 1974 Lease was ineffective because it failed to satisfy the statute of frauds. Dantex counters that Sasser waived their right to rely on the statute of frauds by failing to plead the statute as an affirmative defense pursuant to Rule 94, TEX. R.CIV.P., or raise it in their response to Dantex's motion for partial summary judgment as required by Rule 166a(c), TEX. R.CIV.P. We disagree that Sasser waived the statute of frauds by failing to plead it as an affirmative defense to Dantex's release theory for one simple reason—none of the defendants pleaded release as an affirmative defense to Sasser's declaratory judgment action. We fail to see how Sasser could be required to plead the statute of frauds as an affirmative defense to an affirmative defense that was never pleaded by any appellee.

■ We agree, however, that, to preserve his right to complain that the statute of frauds precluded summary judgment on the release theory expressly presented by Dantex's motion for summary judgment, Sasser was required to raise the statute of frauds in his response to Dantex's motion. *See* TEX.

---

**3.** In support of his argument, Sasser also points to the fact that the 1990 Lease is silent as to its effect on the 1974 Lease; Dantex did not plug the wells drilled under the 1974 Lease until after the 1990 Lease was signed; Dantex informed its working interest partners under the 1974 Lease that the 1974 Lease had "terminated due to noncommerciality"; Tippens testified on deposition that the 1974 Lease had terminated due to nonproduction; and Dantex paid no bonus consideration for the 1990 Lease and yet sold it to Kinlaw for $565 per acre.

Sasser also attempts to discredit Newsom's affidavit. Sasser argues that Dantex prepared the affidavit, without Newsom's input, and then persuaded Newsom to sign it. In fact, however, the record establishes that, while Morris asked Newsom to sign an affidavit, Newsom refused and instead took the affidavit to an attorney and asked for his advice. After discussing the matter with this attorney, Newsom modified the affidavit in at least one respect and then signed it. At his deposition, Newsom confirmed his statement in the affidavit that, by agreeing to the 1990 Lease, Dantex was releasing the 1974 Lease.

R.Civ.P. 166a(c); *Clear Creek Basin Auth.*, 589 S.W.2d at 678–79; *see generally* Texas Summary Judgments at § 4.02. However, even if this point had been preserved, Sasser would not prevail.

Sasser argues that well-established Texas law holds that a release must comply with the statute of frauds to be enforceable. Sasser places his principal reliance on *Shaller v. Allen*, 278 S.W. 873, 875 (Tex.Civ.App.—Amarillo 1925, no writ), and *Texas Pac. Coal & Oil Co. v. Gholson*, 1 S.W.2d 649, 657 (Tex.Civ.App.—Fort Worth 1927), *rev'd* 12 S.W.2d 193 (Tex.Comm'n App.1929, judgm't adopted). However, even if we assume the statute of frauds is available to Sasser, a proposition we seriously doubt, *see, e.g.*, *"Moore" Burger, Inc. v. Phillips Petroleum Co.*, 492 S.W.2d 934, 938–39 (Tex.1972) (statute of frauds is personal defense and cannot be asserted by stranger to contract), we believe both *Shaller* and *Gholson* support Dantex's position in this case and not Sasser's.

In *Shaller*, the lessor sued the lessee for unpaid rentals under a 1919 oil and gas lease. Like Dantex, the lessee argued that an oral release agreement with the lessor superseded the lease's requirement that a written release be delivered to the lessor and filed of record. The court of appeals held that a release of an oil and gas lease was within the statute of frauds. *Shaller*, 278 S.W. at 875. However, the court went on to state that it was not holding that an oral release agreement could never be enforceable:

> We are not to be understood as holding that a written lease to continue for a period of more than one year cannot be rescinded or abrogated by an oral agreement. If there is a consideration for such agreement, possession by the lessor and the presence of such facts as would make the transaction fraudulent, if not enforced, an oral agreement to surrender leased premises held under a written contract is relieved from the operation of the statute of frauds by equities such as would make an oral sale of land valid and enforceable.

*Shaller*, 278 S.W. at 875–76.

In *Gholson*, the lessee, Texas Pacific, sent the lessor, Gholson, a written instrument purporting to release an oil and gas lease.

Gholson's only response to the purported release was to file suit against Texas Pacific for unpaid rentals. In his deposition testimony, Gholson stated that he never intended to accept Texas Pacific's release, and the jury so found. On this basis, the trial court rendered judgment for Gholson. The court of appeals affirmed, agreeing with Gholson that he had not acquiesced in the release and, in any event, it was not effective because it did not comply with the statute of frauds, presumably because it was not signed by Gholson. *Gholson*, 1 S.W.2d at 657. On appeal, however, the Commission of Appeals held that Texas Pacific's release was effective because Gholson "as a matter of law ... accepted the release ... and thereby, in legal effect, consented to a rescission of the lease." *Gholson*, 12 S.W.2d at 196. We therefore disagree with Sasser's assertion that the Commission of Appeals "reversed on other grounds." In practical effect, the Commission ruled that Texas Pacific's unilateral written release, coupled with Gholson's inaction, effected a consensual termination of the lease despite the fact that the release was not signed by Gholson.

We believe this case falls within *Gholson* and the equities anticipated by *Shaller*—by executing the 1990 Lease with the intent and understanding that they were terminating the 1974 Lease, Dantex and Newsom effected a consensual termination of the 1974 Lease. Sasser's first point of error is overruled.

## DUTY OF GOOD FAITH AND FAIR DEALING

■ In his second point of error, Sasser argues that the trial court erred in concluding that, as a matter of the undisputed facts and controlling law, Dantex was not in a special or confidential relationship with Sasser and that, as a result, Dantex did not owe Sasser a duty of good faith and fair dealing or any other fiduciary-type duty. Sasser argues that "evolving principles of Texas law" mandate the conclusion that an oil and gas lessee owes an overriding royalty interest owner a duty of good faith not to engage in intentional acts designed to eliminate or

"washout" the overriding royalty interest owner. We disagree.

The leading Texas case on the relationship between a lessee and an overriding royalty interest owner in this context is *Sunac Petroleum Corp. v. Parkes,* 416 S.W.2d 798 (Tex. 1967). In *Sunac* the plaintiff Parkes was granted an oil and gas lease in 1948. Subsequently, Parkes assigned the lease to Sunac, but retained for himself an overriding royalty interest. Significantly, this assignment expressly provided that " 'the overriding royalty [would] apply to any extensions or renewals of the lease assigned.' " *Id.* at 804. In 1959, the lessor (like Newsom) "asserted that a question existed as to whether or not said lease had been maintained in force and effect. . . ." *Id.* at 800. Apparently in an effort to resolve all doubts, the lessor and Sunac entered into a new lease on substantially different terms. Sometime thereafter, Sunac ceased paying Parkes his overriding royalty. Parkes sued for a judicial declaration that the 1959 Lease was burdened by his overriding royalty interest and for the royalties allegedly due.

The court first determined that the 1948 Lease terminated by its own terms, and the 1959 Lease was not a renewal or extension of the 1948 Lease. *Id.* at 802–03. The court next considered whether the 1959 Lease should be treated as a renewal or extension of the 1948 Lease under a constructive trust theory such that Parkes' overriding royalty interest continued. *Id.* at 803. Acknowledging that other jurisdictions had so held, the court recognized two bases for these holdings: "(1) specific language in the assignment or (2) the close relationship between the parties shown by the particular facts involved." *Id.* at 803.

With respect to the first theory, the court recognized that Parkes' assignment to Sunac contained the magic "phraseology" applying his overriding royalty to any extensions or renewals of the 1948 Lease. However, the court declined to employ this ground to justify a constructive trust theory in Parkes' situation because his assignment expressly provided that Sunac was under "no duty to develop the land or continue the lease in force; to the contrary, the assignment ex-

pressly gave it the right to surrender the lease at any time without Parkes' consent." *Id.* at 804.

Sasser's situation is, of course, even less compelling than Parkes. Not only does the 1974 Lease contain a provision expressly permitting Dantex to surrender all or any part of the lease premises, as was the case in Parkes' assignment to Sunac, but Sasser concedes that, unlike Parkes' assignment, the instrument creating his overriding royalty interest does not provide that the overriding royalty interest will apply to renewals and extensions of the 1974 Lease. On this basis alone, *Oldland v. Gray,* 179 F.2d 408 (10th Cir.1950), *cert. denied,* 339 U.S. 948, 70 S.Ct. 803, 94 L.Ed. 1362 (1950), the "washout" case recognized by the supreme court, *Sunac,* 416 S.W.2d at 804, and cited by Sasser is distinguishable. *See Oldland,* 179 F.2d at 411 (subsequent lessees took assignment of renewal of lease "with knowledge of and subject to the interest of the Oldland Group"). For the same reason, Sasser's reliance on *Exploration Co. v. Vega Oil & Gas Co.,* 843 S.W.2d 123 (Tex.App.—Houston [14th Dist.] 1992, writ denied), is misplaced. *See id.* at 124, 126 (declining to impose fiduciary duty on lessee despite fact that assignment contained clause providing that overriding royalty interest would apply to all renewals and extensions of lease).

The *Sunac* Court also declined to justify a constructive trust in Parkes' favor on the second basis employed by courts in other jurisdictions—a special relationship between the parties—despite the fact that it had "previously held that a constructive trust arises where there is a fiduciary or confidential relationship between two or more parties and the party holding certain property would profit by a wrong or be unjustly enriched if he were allowed to keep the property." *Sunac,* 416 S.W.2d at 804. The basis for the court's holding in this respect was twofold: (1) the general rule that "the assignment of an oil and gas lease reserving an overriding royalty in the assignment does not usually create any confidential or fiduciary relationship between the assignor and the assignee"; and (2) the absence of any facts before the court that would provide a "basis for a hold-

ing that there existed a confidential or fiduciary relationship." *Id.* at 804–05. So it is in this case. There is simply no evidence in the record before us of any fact that would suggest an exception to the general rule. We therefore decline Sasser's invitation to extend the fiduciary duty imposed upon an executive in *Manges v. Guerra,* 673 S.W.2d 180, 183–84 (Tex.1984), to a lessee in Dantex's position.

Sasser attempts to distinguish this aspect of *Sunac* on the ground that the lease involved there expired by its own terms, while the 1974 Lease involved here was terminated by Dantex—in bad faith—when it entered into the 1990 Lease. As Dantex points out, however, Sasser's argument is circular; Sasser argues that a duty of "good faith" should be imposed because Dantex acted in "bad faith," but Dantex's acts would have been in "bad faith" only if its contractual right to surrender the 1974 Lease were subject to a duty to act in "good faith." Moreover, we believe the method by which a lease is terminated—so long as it is contractually permitted—is a distinction without a difference. As noted above, one basis for the *Sunac* Court's rejection of Parkes' constructive trust theory was the fact that Sunac was under no duty to develop the lease and, in fact, was expressly permitted to surrender all or any part of the lease without Parkes' consent. Indeed, it was the unilateral surrender clause that the court held "materially distinguishes the cases relied upon by Parkes." *Sunac,* 416 S.W.2d at 804; *cf. Exploration Co.,* 843 S.W.2d at 126 (declining to impose fiduciary duty on lessor even in absence of surrender clause).

Sasser also argues that this court has previously "granted relief to an overriding royalty interest owner who was harmed by the intentional acts of a leasehold owner," citing *Cain v. Neumann,* 316 S.W.2d 915 (Tex.Civ. App.—San Antonio 1958, no writ). However, even if we were to assume that *Cain* somehow survived *Sunac*,[4] it is nonetheless distinguishable by one simple fact—the lease involved in *Cain* did "not contain a surrender clause nor a partial release clause." *Id.* at 920. And it is this contractual right to uni-

laterally terminate the lease, coupled with the absence of any facts justifying the imposition of a confidential or fiduciary relationship, that conclusively defeat Sasser's duty argument. *See Montgomery v. Phillips Petroleum Co.,* 49 S.W.2d 967 (Tex.Civ.App.— Amarillo 1932, writ ref'd) ("Whatever a man has a legal right to do, he may do with impunity, regardless of motive . . . ."), *cited in Sunac,* 416 S.W.2d at 804.

We recognize that the Fifth Circuit, in dicta, has indicated that it might impose a duty of good faith and fair dealing "if the facts . . . suggested that [the lessee] surrendered its interest in the lease to destroy the rights of the overriding royalty interest owner." *Matter of GHR Energy Corp.,* 979 F.2d at 41. We do not believe it would do so on the uncontroverted facts established by the summary judgment proof in this case, *i.e.,* Newsom and ultimately Dantex believed that the 1974 Lease had terminated by its own terms; Dantex proposed a new lease only after Newsom refused Dantex's request that he ratify the 1974 Lease; and the 1990 Lease provided a larger royalty for Newsom and exacted additional consideration from Dantex (the drilling of a $1 million horizontal well within the six-month primary term). More importantly, based upon *Sunac,* we do not believe the Texas Supreme Court would recognize such a duty on the facts before us, and it is by that court and not the Fifth Circuit that we are bound. Accordingly, we hold that Dantex did not owe Sasser a duty of good faith and fair dealing or any other fiduciary-type duty and overrule Sasser's second point of error.

### CONCLUSION

The trial court properly granted Dantex's motion for partial summary judgment as to Sasser's declaratory judgment action because, by entering the 1990 Lease, the parties effectively terminated and released the 1974 Lease and thereby extinguished Sasser's overriding royalty interest. The trial court also properly granted Dantex's motion as to Sasser's breach of good faith and fair dealing claim because Dantex owed Sasser

---

4. *See In the Matter of GHR Energy Corp.,* 979 F.2d 40, 41 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993) (rejecting *Cain* as authoritative).

no such duty. Accordingly, the judgment is affirmed.