NUMBER 13-02-00245-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI - EDINBURG







LAVACA BAY AUTOWORLD, L.L.C., Appellant, 



v.




MARSHALL PONTIAC BUICK OLDSMOBILE, Appellee.





 

On appeal from the 267th District Court of Calhoun County, Texas.

 



 


O P I N I O N


Before Justices Yañez, Castillo and Garza

Opinion by Justice Garza



Introduction

 

 Appellant, Lavaca Bay Autoworld, L.L.C. ("Lavaca Bay"), appeals from the 267th District Court's grant of summary
judgment in favor of appellee, Marshall Pontiac Buick Oldsmobile, Inc. ("Marshall"). We reverse and render judgment for
appellant.

I. Background

This is a contract dispute arising from the sale of an automobile dealership. In September 2000, the parties agreed that
Lavaca Bay would purchase Marshall's dealership in Port Lavaca, Texas. To that effect, they signed a document entitled
"Asset Purchase Agreement Between Marshall Pontiac Buick Oldsmobile, Inc. and Lavaca Bay Autoworld, L.L.C." ("the
Agreement"). At the same time, they also signed a document entitled "Lavaca Bay Autoworld-Marshall Auto Center Asset
Purchase Agreement Schedule 2.1" ("the Worksheet"). The Worksheet lists the total purchase price Lavaca Bay paid for
the dealership, as well as the individual prices for the various assets included in the sale. Lavaca Bay drafted both the
Agreement and the Worksheet. It also calculated and recorded the prices written on the Worksheet. 

 After closing the deal, Lavaca Bay informed Marshall that it had miscalculated the final purchase price. Specifically, it
claimed to have overpaid Marshall for the new cars included with the dealership. Marshall disagreed. 

 Marshall commenced the instant action, seeking a declaratory judgment that it "does not owe [Lavaca Bay] any other or
further sums" under their contract. Lavaca Bay counterclaimed for declaratory judgment, breach of contract, fraud, mutual
mistake, and mistake with inequitable conduct. 

 Both parties filed motions for summary judgment and no-evidence motions for summary judgment, each asking the trial
court to declare its interpretation of the Agreement to be correct. The trial court granted Marshall's motion for summary
judgment. Lavaca Bay appeals the judgment.

We hold that Lavaca Bay is entitled to summary judgment on its claim for declaratory relief. 

II. Standard of Review

We review summary judgment decisions de novo. Sasser v. Dantex Oil & Gas, 906 S.W.2d 599, 602 (Tex. App.--San
Antonio 1995, writ denied). When both sides move for summary judgment and the trial court grants one motion but denies
the other, the reviewing court should review both sides' summary judgment evidence, determine all questions presented,
and render the judgment that the trial court should have rendered. FM Props. Operating Co. v. City of Austin, 22 S.W.3d
868, 872 (Tex. 2000). Here, both sides moved for traditional summary judgment and for no evidence summary judgment. 
The two forms of summary judgment are distinct and invoke different standards of review. 

With respect to traditional summary judgments, the Texas Supreme Court has said:

[T]he question on appeal . . . is not whether the summary judgment proof raises [a] fact issue[,] . . . but is whether the
summary judgment proof establishes as a matter of law that there is no genuine issue of fact as to one or more of the
essential elements of the plaintiff's cause of action . . . . [T]he judgment sought should be granted, and if granted should be
affirmed, only if the summary judgment record establishes a right thereto as a matter of law.

Gibbs v. General Motors Corp., 450 S.W.2d 827, 828 (Tex. 1970). 

We apply a different standard in reviewing no-evidence motions for summary judgment; we use the legal sufficiency
standard applied to pre-trial directed verdicts. Zapata v. Children's Clinic, 997 S.W.2d 745, 747 (Tex. App.--Corpus Christi
1999, pet. denied). We review the evidence in the light most favorable to the non-movant, disregarding all contrary
evidence and inferences. Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997); Burroughs Wellcome
Co. v. Crye, 907 S.W.2d 497, 499 (Tex. 1995). If the non-movant produces evidence to raise a genuine issue of material
fact, summary judgment is improper. Tex. R. Civ. P. 166a(i).

The common denominator between the traditional summary judgment standard of review and the no-evidence standard is
that in either context, we review all summary judgment evidence on file to determine whether any fact issues remain for a
jury to decide. Brooks v. First Assembly of God Church of Cleburne, 86 S.W.3d 793, 796 (Tex. App.--Waco 2002, pet.
filed). 

We agree with the parties that this case presents only a matter of contract interpretation. There are no genuine issues of
material fact but solely legal issues for our review. Furthermore, since both parties argue that they are entitled to judgment
as a matter of law but fail to specify which elements of their opponents' legal claims lack evidence, we review all of their
arguments under the standard for traditional summary judgment. Hamlett v. Holcomb, 69 S.W.3d 816, 819 (Tex.
App.--Corpus Christi 2002, no pet.) (holding that the parties' mere labeling of a motion for summary judgment as a
no-evidence motion is not determinative and that where it is not readily apparent that the summary judgment motion is
sought under Rule 166a(i), the reviewing court will presume that the motion is filed under Rule 166a(c) and analyze it
under the traditional summary judgment standard of review); Michael v. Dyke, 41 S.W.3d 746, 751 (Tex. App.--Corpus
Christi 2001, no pet.) (same); Oasis Oil Corp. v. Koch Ref. Co, L.P., 60 S.W.3d 248, 252 (Tex. App.--Corpus Christi 2001,
pet. denied) (interpreting Rule 166a(i) to mean that a party moving for a no-evidence motion for summary judgment must
fulfill certain specific requirements, including among other things: the motion must state the elements of the claim as to
which there is no evidence; it must be specific in challenging the evidentiary support for a particular element of a claim;
and it may not be conclusory or a general no-evidence challenge). 

Because the trial court granted Marshall's motion for summary judgment without specifying the grounds for its ruling, the
summary judgment will be upheld if any of the theories Marshall advanced are meritorious. Oasis, 60 S.W.3d at 255-56
(citing State Farm Fire & Cas. Co. v. S.S. & G.W., 852 S.W.2d 374, 380 (Tex. 1993)). 

III. Analysis

Lavaca Bay claims it overpaid Marshall for the dealership's new vehicles, and Marshall insists that it did not. Both parties
agree on the amount that Lavaca Bay actually tendered to Marshall in exchange for the dealership; they dispute whether the
amount tendered was correct under the Agreement. Their respective claims thus depend on our interpretation of the terms
of their contract, in particular, those of the Agreement and the Worksheet. We therefore begin our discussion with those
documents.

The Agreement provides instructions for calculating the purchase price for the dealership. Section 3.1 says, "The
consideration to be paid by Buyer to Seller for the Purchased Assets will be the cash consideration determined in
accordance with Schedule 2.1 and Buyer's assumption of the Lease Agreements less Floor Plan amounts."

Notably, there are two different "Schedule 2.1's." Page 17 of the Agreement is titled "Schedule 2.1." The Worksheet is
also titled "Schedule 2.1." For simplicity, we will refer to page 17 of the Agreement as "the Formulas" because it recites
specific formulas for calculating the price of each asset included in the sale. 

The Worksheet and the Formulas work in tandem. The Worksheet provides a blank space for each of the prices derived
using the Formulas. The Worksheet also provides a total purchase price for the entire dealership, which is calculated by
adding the individual prices derived using the Formulas. Other than the instructions given by the Formulas, the Agreement
is silent on how to complete the Worksheet. 

The Worksheet's Price

The Worksheet indicates that Lavaca Bay paid "zero" dollars for Marshall's inventory of new cars. According to Lavaca
Bay, the selling price should have been negative. It argues that under the Agreement, it should have received credit for the
holdbacks Marshall received from the manufacturer. Lavaca Bay claims it paid too much because the holdbacks were not
deducted from the final price. Marshall maintains that Lavaca Bay did not overpay. 

The Formulas' Price

 We turn to the Formulas. Under the heading "New Vehicles," the Formulas state, "All New Vehicles will be purchased by
Buyer from Seller at Dealer Net Cost less any Cost of Repair less Floor Plan amount." Thus, the three variables that
determine the purchase price for new vehicles are: (1) Dealer Net Cost; (2) Cost of Repair; and (3) Floor Plan amount. The
Agreement defines all three variables. 

 "Dealer Net Cost" approximates the actual expense incurred by the dealer in acquiring a new car. Article I of the
Agreement explains that "Dealer Net Cost" equals "the price for an item originally invoiced to Seller by manufacturer, the
actual cost of freight, handling and dealer installed accessories and conversions, less holdback, invoiced advertising and
insurance and less any and all applicable incentives . . . ." (emphasis added). "Cost of Repair" is defined as "the actual cost
to the Dealership to repair any damage to any vehicle . . . ." The "Floor Plan" is the "money owed by Seller to any financial
institution holding a security interest in any vehicle." It is the money a dealer borrows to acquire new cars.

To recap, the Formulas say that the purchase price for new automobiles is "Dealer Net Cost less any Cost of Repair less
Floor Plan Amount." 

Holdbacks

Both parties agree that this dispute concerns the proper treatment of manufacturer holdbacks under the Agreement. A
holdback is a percentage of the Manufacturer's Suggested Retail Price (MSRP) that a car dealer collects from the
manufacturer. (1) The holdbacks for the new cars sold with the Marshall dealership totaled $30,311.94. Marshall retained
this sum. Although Lavaca Bay assumed responsibility for the Floor Plan Amounts, that is, the loans used to acquire the
new cars, Marshall kept the manufacturer holdbacks. Both parties agree that the Agreement excluded the holdbacks from
the deal.

Lavaca Bay, however, claims that it inadvertently failed to subtract the holdbacks when it calculated the prices of the new
vehicles. Essentially, Lavaca Bay claims to have unintentionally paid for the holdbacks. It asserts that Marshall thus got
the holdback amounts twice: once from General Motors Corporation and once from Lavaca Bay. 

Marshall argues that it is entitled to the holdbacks. Lavaca Bay responds that even though Marshall is entitled to them, it
nevertheless collected a higher purchase price than that specified by the Formulas. The alleged overpayment equals the
holdback amounts that Lavaca Bay failed to subtract from the price of the new cars.

The trial court agreed with Marshall. It declared, "The contract between . . . [Marshall and Lavaca Bay] provided that . . .
[Marshall] was entitled to keep and retain the 'holdback' sums in the amount of $30,311.94 . . . . [Lavaca Bay] is not
entitled to recover the 'holdback' or any other sums from . . . [Marshall]."

Issues Presented

The issues before this Court are: (1) whether Marshall or Lavaca Bay is entitled to the "holdback" amounts under the
Agreement; (2) whether Lavaca Bay overpaid Marshall under the terms of the Agreement; and (3) whether Lavaca Bay can
recover any money from Marshall.

1.

We conclude that under the terms of the Agreement, Marshall did not sell any holdback payments to Lavaca Bay. The
Agreement specifies which assets are included in the sale of the dealership and which are excluded. Section 2.2 states,
"Only the Purchased Assets are being sold to Buyer by Seller pursuant to this Agreement and no Excluded Assets are
subject to the purchase and sale contemplated by this Agreement." Article 1, in turn, defines "Excluded Assets." They are
"cash on hand or on deposit, accounts with any financial institution, accounts receivable, notes receivable, hold back
payments due Seller from Franchisor as of the Closing Date . . . ." (emphasis added). 

This Court cannot find (and the parties do not cite) any language in the Agreement that indicates that Lavaca Bay was
buying the holdback payments from Marshall. Furthermore, the parties agree that they never even discussed holdbacks
prior to signing the Agreement and the Worksheet. Those documents do not say that Lavaca Bay was buying them. We
therefore agree with the trial court's conclusion that under the terms of the Agreement Marshall is entitled to retain the
holdbacks. 

2.

Nevertheless, Lavaca Bay claims Marshall overcharged it for the new cars. The Agreement specifies that the holdback be
subtracted from the "Dealer Invoice Amount" to arrive at "Dealer Net Cost," which is then used to calculate the purchase
price for a new car. Lavaca Bay asserts that it inadvertently failed to subtract the holdback amounts, causing the actual
purchase price for the new cars to exceed the contract price by an amount equal to the holdback payments. Marshall
contends that it is entitled to the holdback amounts and that Lavaca Bay did not overpay.

We agree with Lavaca Bay. As we have already concluded, the Agreement allows Marshall to keep the holdbacks. Even
so, Marshall collected more money from Lavaca Bay than the Agreement provided. Lavaca Bay paid for the holdbacks that
the parties agreed Marshall would retain. 

The Agreement supports Lavaca Bay's position. Section 3.1 says, "The consideration to be paid by Buyer to Seller for the
Purchased Assets will be the cash consideration determined in accordance with Schedule 2.1 . . . ." In relevant part, the
Formulas read, "All new cars will be purchased by Buyer from Seller at Dealer Net Cost less any Cost of Repair less Floor
Plan Amount." Article 1 of the Agreement defines "Dealer Net Cost." It is "the price for an item originally invoiced to
Seller by manufacturer . . . less holdback . . . ." (emphasis added). Thus, the Agreement unambiguously instructs the parties
to subtract the holdback amount from the selling price. 

Marshall admits that the final selling price it received from Lavaca Bay included the cost of the holdbacks. We therefore
conclude that Lavaca Bay paid more money to Marshall than the Formulas required.

Still, according to the terms of the Agreement, the Worksheet became part of the Agreement when the parties signed it. 
Consequently, we have two directly conflicting provisions in the same contract. The Worksheet says the sales price for the
new cars is zero, whereas the Formulas say that the price is negative $30,311.94.

The parties agree that they never discussed the holdbacks prior to executing the Agreement and the Worksheet. They also
agree that Lavaca Bay completed the Worksheet and that Lavaca Bay calculated the final selling price written on the
Worksheet. The question before this Court is which price prevails. 

The primary concern of the courts in construing contracts is to ascertain and give effect to the parties' intentions as
expressed in their writings. Lenape Res. Corp. v. Tennessee Gas Pipeline Co., 925 S.W.2d 565, 574 (Tex. 1996) (citing
Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983)). Although the parties in this case may have had conflicting intentions,
at least regarding the holdbacks, in construing their contract, we look to their objective intent as manifested in their writings
and not their subjective intent. In doing so, we cannot reconcile the conflicting price provisions. 

To determine which price governs the Agreement, we must turn to the rules of contract interpretation. They favor validity
and instruct us to examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of
the contract so that none will be rendered meaningless. Universal C.I.T. Credit Corp. v. Daniel, 243 S.W.2d 154, 158
(Tex. 1951). No single provision taken alone will be given controlling effect; rather, all the provisions must be considered
with reference to the whole instrument. Myers v. Gulf Coast Minerals Mgmt. Corp., 361 S.W.2d 193, 196 (Tex. 1962);
Citizens Nat'l Bank in Abilene v. Texas & P. Ry. Co., 150 S.W.2d 1003, 1006 (Tex. 1941). 

Returning to the Agreement, two different provisions indicate that the holdback payments were to be subtracted from the
purchase price. First, Section 2.2 excludes holdbacks from the deal. It reads, "Only the Purchased Assets are being sold to
Buyer by Seller pursuant to this Agreement and no Excluded Assets are subject to the purchase and sale contemplated by
this Agreement." Article 1 defines "Excluded Assets" as "cash on hand or on deposit, accounts with any financial
institution, accounts receivable, notes receivable, hold back payments due Seller from Franchisor as of the Closing Date . . .
." (emphasis added). 

Second, by using "Dealer Net Cost" as the basis of the price for new vehicles, the Formulas establish that holdbacks should
have been subtracted from the final purchase price. After all, "Dealer Net Cost" is "the price for an item . . . invoiced to
Seller . . . less holdback." (emphasis added). 

In sum, two independent provisions of the Agreement state that the holdback amounts were to be deducted from the
purchase price, and no language in any of the documents indicates that Lavaca Bay was to pay for them.

The Worksheet is the only writing that supports Marshall's argument that it is entitled to the holdbacks and that Lavaca Bay
must also pay for them. Without explanation, it lists a price that both parties agree includes the holdback amounts. 
Marshall's entire argument rests on a single number, a zero. 

Marshall argues that the price listed on the Worksheet, the zero, trumps the other two provisions of the Agreement, which
together yield a negative price. It attempts to buttress this contention with three different parts of the Agreement. We
disagree with Marshall's reading of all three provisions.

First, Marshall cites Paragraph 2.1, which states, "The allocation of the consideration for the purchased assets as set forth
on Schedule 2.1 will be conclusive and binding for all purposes . . . ." Marshall reads this language to mean that the
numbers written on the Worksheet control over any conflicting contract provisions, specifically, the Formulas. 

The language, however, is susceptible to more than one interpretation. It also can be read to mean that the Formulas
preempt any other allocation of the purchase price, even the prices recorded on the Worksheet. After all, both the Formulas
and the Worksheet are formally titled "Schedule 2.1." Paragraph 2.1 could be referring to either document. A third reading
of the language is that it refers concurrently to both the Formulas and the Worksheet. If so, both documents would be the
conclusive allocation of the consideration.

The provision before us can be read three different ways but has only one reasonable meaning. We conclude that the
language in Paragraph 2.1 refers to both the Worksheet and the Formulas. The two documents were not intended to
conflict. The prices calculated using the Formulas were intended to be (and were in fact) recorded on the Worksheet. 
Understandably, then, the Agreement does not give particular weight to either document but simply refers to them
collectively as "Schedule 2.1." We disagree with Marshall's contention that the language of Paragraph 2.1 elevates the
Worksheet above the Formulas.

Second, Marshall uses the definition of "Purchase Price," found in Paragraph 3.1 of the Agreement, to support its argument
that the price written on the Worksheet trumps the Formulas. That language reads, "The consideration to be paid by Buyer
to Seller for the purchased assets will be the cash consideration determined in accordance with Schedule 2.1." For the same
reasons supporting our conclusion regarding the language of Paragraph 2.1, we conclude that the definition of "Purchase
Price" gives both the Formulas and the Worksheet equal weight and does not favor one over the other.

The third provision Marshall relies on to establish the superiority of the Worksheet's price is entitled "Entire Agreement:
Amendment." It states:

This agreement, the related agreements and schedules, exhibits and attachments to such agreements contain the entire
agreement of the parties with respect to the purchase and sale of the purchased assets. This agreement may be amended
only by an instrument in writing signed by the parties.

(emphasis added). Marshall argues that the Worksheet amended the Agreement, superseding the Formulas. We disagree.

The Worksheet did not amend the Agreement but rather became part of the original deal. Paragraph 10.6 of the Agreement
explains:

Each and every schedule or exhibit referred to in and/or attached to this Agreement or referred to in and/or attached to
another schedule or exhibit to this agreement is hereby incorporated by reference for all purposes as fully as if such exhibit,
and all of its contents, had been repeated verbatim in the body of this Agreement.

(emphasis added). The Worksheet is a "schedule." It was attached to the Agreement, and as Marshall points out, the
Agreement refers to the Worksheet in two different places: under the headings "Purchased Assets" and "Purchase Price." 
Thus, the Worksheet did not amend the Agreement but was incorporated into it as if the Worksheet "had been repeated
verbatim in the body" of the Agreement. 

In sum, we find Marshall's arguments unpersuasive because they each rest on the same single digit, a zero. Lavaca Bay's
arguments, in contrast, are supported throughout the Agreement. Marshall asks us to ignore two elaborate price provisions
in favor of the zero written on the Worksheet. To do so would violate the Texas Supreme Court's admonition that "no
single provision taken alone will be given controlling effect . . . [and that] all . . . provisions must be considered with
reference to the whole instrument." Coker, 650 S.W.2d at 393 (citing Myers, 361 S.W.2d at 196); Citizens Nat'l Bank, 150
S.W.2d at 1006 (Tex. 1941). We agree with Lavaca Bay and, accordingly, reject Marshall's arguments. 

The rules of contract interpretation support our conclusion. First, terms stated earlier in the contract are favored over
conflicting terms recited later in the document. Coker, 650 S.W.2d at 393 (citing Ogden v. Dickinson State Bank, 26 Tex.
Sup. Ct. J. 200, 202 (Tex. 1983), withdrawn, aff'd on reh'g, 662 S.W.2d 330 (Tex. 1983)). Here, Lavaca Bay's terms come
before Marshall's. 

Second, when differences exist between terms in the same instrument, those that contribute most essentially to the
agreement are entitled to greater consideration. Caranas v. Morgan Hosts-Harry Hines Blvd., Inc., 460 S.W.2d 225, 228
(Tex. App.--Dallas 1970, no writ) (approving the rule as stated in 13 Tex. Jur.2d, Contracts, § 142). In this case, Lavaca
Bay's terms contribute more essentially to the contract than Marshall's. The Formulas explicitly instruct the parties on how
to determine the purchase price for each new car. Marshall's only term is a zero. As a price, it is necessarily less
fundamental to the contract than the Formulas, which the parties agreed would determine all prices in the transaction. 

Finally, and perhaps most importantly, a single contract provision may not be interpreted so as to destroy and contradict
other express provisions and the whole tenor and effect of the parties' contract. Priem v. Shires, 697 S.W.2d 860, 865 (Tex.
App.--Austin 1985, no writ) (citing Coker, 650 S.W.2d at 393). Marshall invites our Court to violate this rule. It asks us to
use a zero to not only contradict but to destroy the Formulas and their express effect on the Agreement. We refuse.

When portions of a contract cannot be reconciled, a court may resolve the conflict by striking down one of the provisions. 
Ogden v. Dickinson State Bank, 662 S.W.2d 330, 332 (Tex. 1983) (citing Woods v. Sims, 273 S.W.2d 617 (Tex. 1954));
Henry v. Gonzalez, 18 S.W.3d 684, 688 (Tex. App.--San Antonio 2000, pet. dism'd by agr.) (striking down an
irreconcilable contract provision). For the reasons stated above, we strike down the zero written on the Worksheet and
conclude that the contract price does not include the holdback sums. Lavaca Bay overpaid Marshall by $30,311.94. Insofar
as the trial court's judgment holds that Lavaca Bay did not overpay Marshall according to their Agreement, we reverse and
render judgment for Lavaca Bay. 

3.

The final issue before us is whether Lavaca Bay can recover its overpayment from Marshall. The Uniform Declaratory
Judgment Act ("the Act") grants us authority to declare the parties' rights. That power is sufficient to resolve their dispute. 

Section 1 of the Act gives "courts of record . . . the power to declare rights, status, and other legal relations whether or not
further relief is or could be claimed." Tex. Civ. Prac. & Rem. Code Ann. § 37.001 (Vernon 1997). The Act's stated
purpose is "to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal
relations." Id. at § 37.002(b); Bonham State Bank v. Beadle, 907 S.W.2d 465, 467 (Tex. 1995). As applied to contracts, the
purpose of declaratory relief is to obtain an interpretation of the contract. Emmco Ins. Co. v. Burrows, 419 S.W.2d 665,
670 (Tex. App.--Tyler 1967, no writ). Here, a judicial declaration of the parties' rights and obligations under their contract
would resolve the entire controversy. Declaratory relief is therefore appropriate. Board of Water Eng'rs v. City of San
Antonio, 283 S.W.2d 722, 724 (Tex. 1955); Public Util. Comm'n v. City of Austin, 728 S.W.2d 907, 911 (Tex.
App.--Austin 1987, writ ref'd n.r.e.). In its original petition, Marshall asked the trial court to "determine and declare . . .
[its] rights and entitlements . . . under and pursuant to the . . . contract, including but not limited to, the determination and
declaration that . . . it does not owe . . . [Lavaca Bay] any other or further sums." Lavaca Bay's motion for summary
judgment, in contrast, asked the trial court to declare "as a matter of law that Marshall does indeed owe Lavaca Bay
additional monies . . . in the amount of $30,311.94." The trial court granted Marshall's motion for summary judgment and
declared, "The contract between . . . [Marshall and Lavaca Bay] provided that . . . [Marshall] was entitled to keep and retain
the 'holdback' sums in the amount of $30,311.90. [Lavaca Bay] is not entitled to recover the 'holdback' or any other sums
from . . . [Marshall]."

We reverse the trial court's judgment and hold that Lavaca Bay is entitled to summary judgment. Marshall owes Lavaca
Bay $30,311.94 for its overpayment, and in addition, we grant Lavaca Bay's request to recover reasonable attorney's fees
from Marshall in the amount of $8,607.00. Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (Vernon 1997).

Having resolved the parties' dispute in Lavaca Bay's favor, we do not address Lavaca Bay's remaining theories of recovery.

 

DORI CONTRERAS GARZA,

Justice

Opinion delivered and filed

this 3rd day of April, 2003.

1. Holdbacks are typically 2-3% of the MSRP, and they appear on the factory invoice next to other common fees such as
the destination and dealer advertising charges. Holdbacks ensure that even dealers who sell their new cars at dealer invoice
cost have an opportunity to profit on their sales. They work as follows. 

 When a dealer orders a car from the factory, it typically will finance the purchase through the car manufacturer. This
inventory financing creates interest expense for the dealership. The longer a new car sits on the dealership's lot, the more
interest the dealer must pay. The dealership must also bear all the risks and costs of maintaining its inventory, insuring the
lot, staffing the dealership, and, most importantly, selling the cars. 

 To help with these expenses and to make inventory acquisition less financially cumbersome for dealerships, car
manufacturers pay the financing expenses for approximately the first six months that a dealership holds its new cars. 
Occasionally, the manufacturers also chip in on the dealership's maintenance expenses. Either way, the payment is made in
a lump sum, which is predetermined by the manufacturer and paid on a quarterly basis. This is the holdback, and the
dealership is entitled to receive it even if a new car is sold the same day it arrives on the lot.