**Opinion issued March 5, 2013**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-11-00593-CV

————————————

**STROUD PRODUCTION, L.L.C., PLANTATION PETROLEUM CORPORATION, AND ROBERT A. STROUD, Appellants**

**V.**

**PATRICK E. HOSFORD, MORRIS L. ETHEREDGE, DAVID T. THREINEN, AND NELSON E. WOODS, Appellees**

**On Appeal from the 405th District Court**
**Galveston County, Texas**
**Trial Court Cause No. 07CV1461**

# O P I N I O N

Appellants, Stroud Production, L.L.C. ("Stroud Production"), Plantation

Petroleum Corporation ("Plantation"), and Robert A. Stroud (collectively, the

"Stroud defendants"),[1] challenge the trial court's judgment, entered after a jury trial, in favor of appellees, Patrick E. Hosford, Morris L. Etheredge, David T. Threinen, and Nelson E. Woods, in appellees' suit against the Stroud defendants for breach of contract, "intentional termination" of overriding royalty interests, conversion, tortious interference, and conspiracy. In twelve issues,[2] the Stroud defendants contend that appellees' "intentional termination claim does not exist under Texas law" and is not supported by legally- or factually-sufficient evidence; there is no evidence to support the "only damages" awarded by the jury; appellees' conversion claim is "barred by the economic loss doctrine and fails for lack of evidence;" there is no evidence that Stroud Production tortiously interfered with appellees' contract with Plantation; appellees' alter ego and conspiracy claims "are barred" and are not supported by legally- or factually-sufficient evidence; the trial court's award of prejudgment interest is not supported by legally- or factually-sufficient evidence; there is no evidence that Plantation breached its obligations to appellees regarding payments owed for overriding royalties from January 2004; the trial court's award of attorney's fees was "on the wrong cause of action" and the

---

[1]  The parties have listed ERG Resources, L.L.C. ("ERG") as an appellant, but ERG is not identified as a party in the trial court's judgment, and there are no issues pertaining to any judgment entered regarding ERG.

[2]  The Stroud defendants identify twenty issues in the section of their appellate brief entitled "Issues Presented," but the argument section of the brief does not track the substance or order of the twenty issues presented. We address the Stroud defendants' issues as argued in their brief.

2

fees were "improperly segregated;" the jury's alter ego findings conflict with its tortious interference and conspiracy findings; the trial court's judgment "suggests a quadruple recovery of attorney's fees;" and a new trial is required in light of appellees' "concealment of evidence" and the trial court's various erroneous evidentiary rulings.

We reverse and render in part, and we remand for a new trial on the issue of attorney's fees and a recalculation of prejudgment interest.

## Background

In June 1978, the Houston Domestic Oil Company ("HDOC") obtained from two corporate lessors, Ruth M. Bowers and John B. Gordon, two oil and gas leases (the "B&G leases") on a 50-acre parcel of land located in the High Island area of Galveston County, Texas. Hosford signed the leases in his capacity as president of HDOC, and, pursuant to the terms of the B&G leases, the lessors, Bowers and Gordon, each retained a 25% "royalty interest" and HDOC obtained a 75% "working interest."[3] The B&G leases had a primary term of one year, were to

---

[3] We note generally that an oil and gas royalty is a share of the product or profit from real property, reserved by the grantor of a mineral lease, in exchange for the lessee's right to mine or drill on land. BLACK'S LAW DICTIONARY 1445 (9th ed. 2009). "Royalty" is commonly defined as the landowner's share of production, free of expenses of production. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121–22 (Tex. 1996). An oil and gas "working interest" consists of the right to the mineral interest granted by an oil and gas lease, so called because the lessee acquires the right to work on the leased property, search, develop, and produce oil and gas, as well as the obligation to pay costs. BLACK'S LAW DICTIONARY at 1745.

3

remain in effect thereafter for so long as oil or gas was produced in commercial quantities, and were to terminate if production ceased for 90 continuous days without the commencement of "additional drilling or reworking operations."

In September 1978, HDOC granted Hosford a 2% overriding royalty interest[4] in any oil and gas produced from the leases. Shortly thereafter, HDOC granted Etheredge a 2% overriding royalty interest and Threinen and Woods each a one-half percent overriding royalty interest. Thus, appellees collectively obtained from HDOC a 5% overriding royalty interest in production from the B&G leases.

HDOC drilled wells that produced oil in commercial quantities, and appellees, according to their assignments, received payments for their overriding royalty interests. Although ownership of the B&G leases subsequently changed hands several times, appellees retained their overriding royalty interests and continued to receive their payments for production until the end of December 2003, when Plantation acquired the leases.

In late 2002 and early 2003, Stroud, who held other lease interests, became interested in acquiring the B&G leases because he had concluded that the Bowers and Gordon properties were "capable of more production" and contained

---

[4] An overriding royalty interest is a non-participating interest in a mineral lease. *Ridge Oil Co., Inc. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 155 (Tex. 2004). An owner of an overriding royalty "has no right and thus no ability to go onto the underlying property and drill or otherwise take action to perpetuate a lease." *Id.* Rather, such an owner is dependent on the lessee to preserve the lease. *Id.*

"substantial" untapped reserves. Stroud Production, owned and managed solely by Stroud, hired a landman to investigate the prospect. And Stroud learned that Union Seaboard held the B&G leases, appellees possessed, collectively, their 5% overriding royalty interest, and Bowers and Gordon (and their assigns) retained a 25% royalty interest. In August 2003, Stroud Production offered to purchase the B&G leases from Union Seaboard for $58,000.

Plantation, a company of which Stroud was president and the sole employee, bought the B&G leases on December 1, 2003 for $58,000. Stroud Production became the operator of the leases, under which there was only one producing well operating. Union Seaboard, the prior lessor, had been reporting the ongoing production from the well to the Texas Railroad Commission. It is undisputed that this well continued to produce oil in December 2003 and part of January 2004. Although the Stroud defendants paid appellees their overriding royalty interests from the well's production in December 2004, they did not pay appellees for their overriding royalty interests for the January 2004 oil production until April 2010, shortly before the underlying trial. The Stroud defendants asserted that they did not pay appellees for this month of production because of an oversight.

On January 13, 2004, Stroud Production's landman obtained copies of the assignments of appellees' overriding royalty interests, and he advised Stroud Production that none of appellees' assignments contained "renewals and

5

extensions" clauses. The evidence reveals that "renewals and extensions" clauses may be used to protect overriding royalty interests by ensuring that such interests apply to any leases that qualify as renewals or extensions of prior leases. Stroud admitted that it was "probably a mistake" on his part not to have included a renewals-and-extensions clause in the instrument assigning him his overriding royalty interest, but he had not anticipated a need for such a clause and did not realize that his interest would be subsequently "wash[ed] out" by a lessee. On January 20, 2004, a few days after Stroud Production received notice that appellees did not have renewals and extensions clauses in their assignments, a "polished rod" on the only producing well operating under the leases broke, and production ceased. Stroud's lawyer advised him that he had no obligation to pay the overriding royalty interest owners once the well had ceased production.

In his testimony, Stroud agreed that he was the "decision maker" for both Stroud Production and Plantation. And he knew that after the only remaining producing well operating under the B&G leases ceased production, the Stroud defendants had 90 days to commence work under the leases or they would terminate. Stroud explained that he did not order repairs to the well because of the expenses, but also because he had already offered interests in the property to other investors, albeit under other leases, which are discussed in more detail below. Although Stroud acknowledged that the necessary repairs for the broken well

6

"weren't out of the normal," none of the Stroud defendants conducted repairs or undertook "additional drilling or reworking operations" during the 90-day period after the well had ceased production. Because nothing was done during the 90-day period, the B&G leases terminated on April 20, 2004. Stroud admitted that he intentionally returned the well to production in June 2004 only after the B&G leases had terminated, new leases had been obtained, and the 90-day continuous-operations period had passed. He also admitted that he "did not want any overriding royalty interest on the new leases" and appellees' overriding royalty interests had been "washed out."

Stroud further testified that even before Plantation had acquired the B&G leases from Union Seaboard and before the polished rod on the producing well had broken, he had been interested in obtaining new leases on the same land because he had concerns about the validity and scope of the B&G leases. On February 19, 2004, less than one month after the polished rod on the well had broken and during the 90-day continuous-operations period, Plantation entered into a new lease with Bowers. The new lease applied to the same 50-acre parcel of land covered by the old lease and provided the same royalty structure, but it included other terms that differed from the original B&G lease, such as a different primary term. And the new lease was not burdened by the overriding royalty interests held by appellees

7

under the old B&G lease. Plantation also executed a new lease with Gordon.[5] We, as do the parties, refer to these new leases collectively as the "McNeil leases."

The Stroud defendants continued to evaluate the potential production of the well during the 90-day continuous-operations period under the B&G leases. Shortly after the 90-day period expired, Stroud, on April 29, 2004, made a presentation to a group of potential investors, representing that Stroud intended to repair the broken well and conduct additional work. Concluding that the B&G leases had expired, Stroud repaired the broken well in May 2004 at a cost of approximately $7,500, and resumed production from the well shortly thereafter under the McNeil leases. The Stroud defendants also conducted other new work pursuant to the McNeil leases. Because the McNeil leases were no longer subject to the overriding royalty interests, Plantation's net revenue interest totaled 75%. The McNeil leases were subsequently assigned to Stroud Production and, in 2007, Stroud Production sold the McNeil leases to ERG for approximately $2.5 million, and production from the leases continued.[6]

---

[5]     In their briefing, the Stroud defendants assert that in May 2004, after the B&G leases expired, Plantation obtained a new lease from the Gordon interest. There is no record citation to this new lease, but the parties appear to agree that the Stroud defendants acquired new leases from both Bowers and Gordon or their successors and assigns.

[6]     The parties, in their briefing, generally agree, or at least do not dispute, that production continued on the parcel of land previously covered by the B&G leases.

8

Following the presentation of evidence, the trial court granted a directed verdict in favor of the Stroud defendants on appellees' claims for "breach of duty of good faith and fair dealing," fraudulent concealment, and "breach of implied covenant to develop." The remaining claims were submitted to the jury, which found that Plantation failed to comply with an agreement to pay appellees overriding royalties from the B&G leases for January 2004; Plantation "intentionally terminate[d] the [B&G] Leases to destroy [appellees'] rights to their overriding royalty interests"; Plantation converted appellees' "proceeds from their overriding royalty interests" in the B&G Leases; Stroud Production intentionally interfered with appellees' rights to receive their overriding royalties under the B&G Leases; Stroud was responsible for the conduct of both Plantation and Stroud Production; Stroud Production and Stroud were part of a conspiracy with Plantation and acted with an "intent to deprive [appellees] of the proceeds from their overriding royalty interests;" and Stroud and Stroud Production conspired to damage appellees. In a single damages question pertaining to all of the above causes of action, the trial court asked the jury to calculate an amount that would reasonably compensate appellees for damages caused by the Stroud defendants. The trial court instructed the jury to consider "only" the "unpaid overriding royalties from the [B&G] Leases" and asked it to calculate such damages for three time periods: (1) January 1, 2004 to January 20, 2004 (before production on the

B&G leases ceased), (2) January 21, 2004 to January 1, 2007, and (3) January 1, 2007 to present. The jury awarded damages to appellees for each of the identified time periods. The damages awarded by the jury for the time period January 1, 2004 to January 20, 2004 represented the amount to which appellees were entitled to recover for their overriding royalty interest in the B&G leases prior to the well ceasing production on January 20, 2004. The parties appear to agree that the damages awarded by the jury for the other two time periods generally reflect the amounts that appellees would have received if they had retained their overriding royalty interests in the production that occurred under the McNeil leases.

In its final judgment, the trial court ordered that Hosford and Etheredge each recover from the Stroud defendants actual damages of $196,150,[7] plus pre-judgment interest in the amount of $32,043.75, and Threinen and Woods each recover from the Stroud defendants actual damages of $49,037.50, plus pre-judgment interest in the amount of $8,010.94. The trial court also awarded appellees attorney's fees of $359,479.10, which included appellate attorney's fees.

### Breach of Contract

In their eighth issue, the Stroud defendants argue that the evidence is legally insufficient to support the jury's breach-of-contract finding pertaining to the

---

[7] The actual damages awarded by the trial court in its judgment appear to include the amount found by the jury to have been owed for outstanding royalties from January 2004.

10

payment of overriding royalties for production that occurred under the B&G leases during January 2004 because appellees were "issued checks in April 2010 for all January 2004 production and stock tank oil." In regard to the timing of the payments, the Stroud defendants assert that the "jury was not asked to determine when payments were made" and "no time period for payment was specified" in the question submitted to the jury.

In conducting a legal-sufficiency review of the evidence, we must consider all of the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We will sustain a legal-sufficiency or "no evidence" challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *Id*. at 810. In conducting a legal-sufficiency review, a "court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it." *Id*. at 822. The term "inference" means,

> In the law of evidence, a truth or proposition drawn from another which is supposed or admitted to be true. A process of reasoning by which a fact or proposition sought to be established is deduced as a

11

logical consequence from other facts, or a state of facts, already proved. . . .

*Marshall Field Stores, Inc. v. Gardiner*, 859 S.W.2d 391, 400 (Tex. App.—Houston [1st Dist.] 1993, writ dism'd w.o.j.) (citing BLACK'S LAW DICTIONARY 700 (5th ed. 1979)). For a jury to infer a fact, "it must be able to deduce that fact as a logical consequence from other proven facts." *Id*.

If there is more than a scintilla of evidence to support the challenged finding, we must uphold it. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc*., 960 S.W.2d 41, 48 (Tex. 1998). "'[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.'" *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (quoting *Kindred v. Con/Chem, Inc*., 650 S.W.2d 61, 63 (Tex. 1983)). If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *City of Keller*, 168 S.W.3d at 822; *see also King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *City of Keller*, 168 S.W.3d at 822.

The trial court asked the jury whether Plantation "fail[ed] to comply with the agreement to pay [appellees] their overriding royalties on production from the

12

[B&G] Leases for January 2004." The jury answered "yes" and then awarded Hosford and Etheredge $150 and Threinen and Woods $37.50 for damages incurred from January 1, 2004 until January 20, 2004. And the trial court included these amounts in the actual damages that it awarded to appellees in its judgment.

It is undisputed that appellees did not receive these payments, which were due and owing, until April 2010, shortly before trial. During trial, Hosford complained about the lateness of these payments, noting that he had not received any interest. The jury's breach-of-contract finding is supported by evidence that Plantation failed to timely make the payments. *See* TEX. NAT. RES. CODE ANN. § 91.402 (a) (Vernon 2011) (providing, "If the lease or other agreement does not specify the time for payment, subsequent proceeds must be paid no later than: (1) 60 days after the end of the calendar month in which subsequent oil production is sold; or (2) 90 days after the end of the calendar month in which subsequent gas production is sold"); *id.* § 91.403 (Vernon 2011) (providing for the payment of interest on late payments). Although the Stroud defendants presented evidence that Plantation's failure to timely make the payments was the result of a "mistake," the jury could have reasonably inferred that, by making contractually required payments over six years after they were due, Plantation breached its contract to pay the overriding royalties to appellees. Accordingly, we hold that the evidence is legally sufficient to support the jury's finding that Plantation failed to comply with

13

its contractual obligation to pay appellees their overriding royalties on production from the B&G leases for January 2004 and the trial court did not err in entering judgment in appellees' favor on this claim.

We overrule the Stroud defendants' eighth issue.[8]

## Duty Owed to Overriding Royalty Interests

In their first issue, the Stroud defendants argue that the trial court erred in entering judgment in favor of appellees on their claim for "intentional termination" of their overriding royalty interests because the claim does not exist under Texas law, Plantation had no contractual obligation to perpetuate the B&G leases for the benefit of appellees, Plantation owed no fiduciary duty and had no special relationship with appellees, there are no "public policy reasons for the creation of a new fiduciary duty" owed to appellees, and "the retroactive application of a fiduciary obligation" in this case "would be inequitable given Plantation's reliance on settled Texas law." The Stroud defendants further argue that the evidence is legally and factually insufficient to support the jury's finding that Plantation intentionally terminated the B&G leases to destroy appellees' right to their

---

[8] The Stroud defendants' eighth issue presents a challenge to the liability finding on the breach-of-contact claim. During trial, appellees conceded that the Stroud defendants, shortly before trial, had paid the outstanding royalties for January 2004. The trial court's judgment reflects that it included the principal amounts awarded by the jury for the January 2004 royalties in its award of actual damages, even though those amounts had already been paid. The Stroud defendants raise this matter in their second issue, which we address below.

overriding royalty interests because the B&G leases expired "according to their terms" and not as a result of an intentional act committed by Plantation. Finally, the Stroud defendants argue that the trial court erred in submitting the "intentional termination" question to the jury because the question "lacked sufficient instructions to provide a standard to guide the jury in assessing the conduct of Plantation."

The record contains evidence supporting the jury's finding that the Stroud defendants "intentionally terminated" the B&G leases to "destroy" appellees' overriding royalty interests in the B&G leases.[9] There is no evidence that any Stroud defendant committed any deliberate act in connection with the breaking of the rod on the producing well that was operating under the B&G leases. However, there is sufficient evidence to support an implied finding that, after the well ceased

---

[9] The parties expend considerable effort in arguing whether the record contains any evidence from which the jury could have reasonably inferred that the Stroud defendants "sabotaged" the producing well operating under the B&G leases. However, even accepting that there is no evidence of sabotage, there is ample evidence that Plantation, along with the other Stroud defendants, intentionally sought to terminate the B&G leases.

We note that a party may, of course, intentionally and lawfully terminate a contract in accord with the contract's terms. The Stroud defendants themselves asserted that, rather than continuing under the B&G leases, they sought to acquire new leases, necessarily giving rise to an inference that they sought to terminate the B&G leases. In regard to whether Plantation sought to destroy appellees' overriding royalty interests, Stroud himself testified that he did not want appellees' overriding royalty interests burdening the McNeil leases. As explained above, the jury could have reasonably inferred from Stroud's own testimony that Plantation terminated the B&G leases, at least in part, to divest appellees of their interests.

production, the Stroud defendants elected not to repair the well so that the B&G leases would expire, appellees' overriding royalty interests would be extinguished, and the Stroud defendants would benefit financially by resuming production under new leases that were not burdened by appellees' interests. Appellees also presented evidence that, both before and after the well had ceased production, the Stroud defendants were seeking to acquire new leases on the same property that had been subject to the B&G leases; the Stroud defendants chose not to repair the well even though such repairs could have been completed at reasonable cost compared to what the Stroud defendants had already spent on the B&G leases; the Stroud defendants chose not to repair the well during the 90-day continuous-operations period even though they were convinced that the property held "substantial" untapped reserves; the Stroud defendants were making plans to market interests in the new leases during the 90-day continuous-operations period; and shortly, after the B&G leases expired, the Stroud defendants repaired the well and production resumed under the new McNeil leases unburdened by appellees' overriding royalty interests. In sum, the record contains evidence that the Stroud defendants intentionally terminated the B&G leases to, at least in part, terminate appellees' interests.

However, whether the Stroud defendants' conduct is actionable under Texas law is a separate matter. In determining the existence and scope of what duty, if

16

any, Plantation, as the lessee under the B&G leases, owed to appellees, the holders of overriding royalty interests in production from the B&G leases, we first consider the Texas Supreme Court opinions in *Sunac Petroleum Corp. v. Parkes*, 416 S.W.2d 798 (Tex. 1967), and *Ridge Oil Co. v. Guinn Investments, Inc.*, 148 S.W.3d 143 (Tex. 2004).

In *Sunac*, Parkes sold and assigned to a third party a mineral lease that was later transferred to Sunac. 416 S.W.2d 799–800. Parkes reserved an overriding royalty interest in production from this lease and "any extension or renewal," but the assignment of this lease to Sunac also included a surrender clause, relieving Sunac of any obligation to continue the lease. *Id.* When the lessor questioned the validity of the lease held by Sunac, Sunac procured a new lease on the same land, but with different terms, and Sunac stopped paying the overriding royalties owed to Parkes under the original lease. *Id.* at 800. Parkes contended that his overriding royalty interest applied under the new lease. *Id.* After considering the language of the leases, the Texas Supreme Court concluded that the original lease had terminated and the new lease, which was executed on "substantially different terms," was not a renewal or extension. *Id.* at 802–03.

The supreme court acknowledged that courts in other jurisdictions had, on certain facts, recognized the existence of a "constructive trust" in favor of an overriding royalty interest holder on the basis of "specific language in the

17

assignment" or a "close relationship between the parties." *Id*. at 803. For example, the court explained that other courts had relied upon "relationships of trust and confidence" in concluding that a new lease constituted a "renewal or extension" of an original. *Id*. And the court noted that other courts had offered protection to overriding royalty interest holders in a "washout transaction," which "generally involve[ed] some bad faith on the part of the lessee" and arose when a new lease was taken before the expiration of the original and the original lease was "simply permit[ted] . . . to expire." *Id*. at 804 (citing *Oldland v. Gray*, 179 F.2d 408 (10th Cir. 1950)).

Turning to the facts before it, the Texas Supreme Court noted that, other than the renewals and extensions clause in the instrument granting the overriding royalty interest, there was no evidence of a relationship of trust or confidence between Parkes and Sunac. *Id*. Sunac had obtained the new lease "to protect its interest" only after the lessor had raised concerns about the prior lease. *Id*. The court recognized that renewals and extensions clauses had been cited by other courts as creating a "fiduciary relation," but it construed the renewals and extensions clause in the overriding royalty instrument together with the surrender clause in the lease and concluded that the surrender clause relieved Sunac from any "duty to perpetuate the lease, and thus the overriding royalty." *Id*. The court explained that, "[n]ormally, when an oil and gas lease terminates, the overriding

18

royalty created in an assignment of the lease is likewise extinguished" and, "generally, . . . the assignment of an oil and gas lease reserving an overriding royalty in the assignor does not usually create any confidential or fiduciary relationship between the assignor and his assignee." *Id.* Because no evidence supported the existence of a "confidential or fiduciary relationship" and the provisions of the leases and assignment were "controlling," the court held that the overriding royalty interest expired with the original lease and no constructive trust was warranted. *Id.* at 805.

In *Ridge Oil*, two lessees, Ridge and Guinn, obtained working interests in adjoining tracts of land under a single base lease. 148 S.W.3d at 147–48. The only two producing wells on the entire lease, which were sustaining the lease, were located on the Ridge tract. *Id.* Ridge devised a plan to terminate the entire base lease and obtain new leases on both tracts by shutting off the electricity to the two producing wells for 90 days. *Id.* at 148. After Ridge effectuated his plan and obtained new leases, Guinn sued Ridge for tortious interference and recognition of a constructive trust, contending, in part, that Ridge could not lawfully "washout" his interest. *Id.* at 148–49, 153. Guinn asserted that a lessee could not lawfully surrender or terminate a lease "to destroy the rights of another partial assignee of the lessee's interest." *Id.* at 155. The Texas Supreme Court denied Guinn's request to impose liability for this conduct, stating

19

Even if such a rule of law *might be appropriate in the context of overriding royalty interests* when the underlying lease does not contain an express release provision, *a question we do not address*, there is a material distinction between an overriding royalty interest and that of a lessee. An overriding royalty interest is a non-participating interest. A royalty owner has no right and thus no ability to go onto the underlying property and drill or otherwise take action to perpetuate a lease. An overriding royalty interest owner is wholly dependent on the lessee to keep a lease alive. That is not true of a lessee. A lessee in Guinn's position could continue a lease in effect by drilling a well and obtaining production, or continuing operations until production is obtained, under lease provisions like those in the 1937 lease.

*Id*. (emphasis added).

The supreme court held that Ridge owed no duty to Guinn to continue the original lease and, thus, the original lease terminated by its own terms. *Id*. at 155–57, 160–61("Ridge owed no duty to Guinn to perpetuate the 1937 lease or to procure its renewal or extension for Guinn."). The court concluded that Guinn was not entitled to a constructive trust under any new leases on the Guinn tract because there was no "confidential relationship" between partial assignees of leasehold interests under a single lease. *Id*. at 160. And it further concluded that there was no basis for a tortious interference claim. *Id*. at 160-61.

The Texas Supreme Court's opinions in *Sunac* and *Ridge Oil* indicate that the existence and scope of any duty owed by a lessee to the holder of an overriding royalty interest is an open question under Texas law. However, these opinions

20

direct us to carefully consider the language of controlling documents and the circumstances and relationships of the parties to determine whether any such duty is owed and, thus, whether any actionable wrong has been committed by a lessee who seeks to "intentionally terminate" a lease so as to divest the holder of an overriding royalty interest of his interest.

One Texas court has considered claims, similar to those presented here, that were brought by an overriding royalty interest holder who claimed that his interest had been washed out in "bad faith." *Sasser v. Dantex Oil & Gas, Inc.*, 906 S.W.2d 599, 601–02 (Tex. App.—San Antonio 1995, writ denied). In *Sasser*, which the supreme court in *Ridge Oil* characterized as "instructive," Sasser held an overriding royalty interest under an original lease in which Dantex, the lessee, held a 75% working interest. *Id*. at 601. Sasser's overriding royalty interest did not apply to renewals or extensions of the original lease, and the lease also permitted Dantex unilaterally to surrender it at any time. *Id*. After Dantex and the mineral owner subsequently entered into a new lease, Sasser argued that his overriding royalty interest was not extinguished because there had been production in paying quantities occurring under the original lease at the time that the new lease was executed. *Id*. Sasser accused Dantex of wrongfully attempting to "eliminate or 'washout' [his] overriding royalty interest" in the original lease, "thereby breaching its duty of good faith and fair dealing or other fiduciary-type duty." *Id*.

21

The San Antonio Court of Appeals rejected imposing any such duty, holding that the original lease had terminated when Dantex executed the new lease "with the intent and understanding that" the original lease was released; and the court explained that it was "not material" whether there was production in paying quantities at the time. *Id*. at 603–04.

Sasser asserted that "'evolving principles of Texas law' mandate[d] the conclusion that an oil and gas lessee owes an overriding royalty interest owner a duty of good faith not to engage in intentional acts designed to eliminate or 'washout' the overriding royalty interest owner." *Id*. at 605–06. The court disagreed, noting first that the lease contained a surrender clause and Sasser's assignment, which created his overriding royalty interest, did not contain a renewals and extensions clause. *Id*. at 606. Second, the court noted that there were no facts to establish a confidential or fiduciary relationship. *Id*. at 606–07. The court characterized Sasser's bad-faith claims as being "circular": Sasser argued that a duty of good faith should be imposed *because* there was evidence of bad faith. *Id*. at 607. And it explained that Dantex's acts would have been in "bad faith" only if its contractual right to surrender the original lease had been subject to a duty to act in "good faith" and the "method by which a lease is terminated—so long as it is contractually permitted—is a distinction without a difference." *Id*. In

22

sum, the court held that Dantex did not owe Sasser a "duty of good faith and fair dealing or any other fiduciary-type duty." [10] *Id.*

Other Texas courts have similarly been reluctant to recognize any sort of duty, fiduciary or otherwise, flowing from a lessee to the holder of an overriding royalty interest. For example, in *Exploration Company v. Vega Oil & Gas Company*, the holder of overriding royalty interests in original mineral leases contended that new leases, which were obtained over one year after the old leases had expired and which involved different terms and parties, constituted renewals and extensions of the original leases. 843 S.W.2d 123, 124–25 (Tex. App.—Houston [14th Dist.] 1992, writ denied). Our sister court held that the lessee had established as a matter of law that the leasehold estate under the old leases had expired as a result of non-production, and, thus, the overriding royalty interests in the old leases had also expired. *Id*. at 125. The court noted that there was no authority in Texas supporting the arguments of the overriding royalty interest holders that the lessee owed them a fiduciary obligation or a constructive trust on the new leases was warranted. *Id*. at 126. The court explained that the "mere

---

[10] The court emphasized that the "*contractual right to unilaterally terminate the lease*, coupled with the absence of any facts justifying the imposition of a confidential or fiduciary relationship," defeated Sasser's arguments for the imposition of some type of duty of good faith. *Sasser v. Dantex Oil & Gas, Inc.*, 906 S.W.2d 599, 607 (Tex. App.—San Antonio 1995, writ denied) (emphasis added).

23

assignment of an oil and gas lease reserving an overriding royalty interest does not in itself create a confidential or fiduciary relationship between the assignor and assignee" and "[i]f such a relationship is created, it must be by the terms of the assignment or by other acts of the parties." *Id*. The court concluded that the renewals and extensions clause, and a separate notice clause, did not impose a fiduciary obligation on the lessee. *Id*. at 126–27. The court further concluded that "merely because" the lease did not contain a surrender clause did not "mean that a fiduciary relationship exist[ed]." *Id*. at 126. Because there was no evidence of fraud, bad faith, or the existence of a fiduciary relationship, and because there was "no Texas case law expressly support[ing] [the] imposition of a fiduciary relationship or constructive trust" on the facts before it, the court held that no overriding royalty interest applied to the new leases. *Id*. at 127.

In *McCormick v. Krueger*, the holders of overriding royalty interests in an oil and gas lease contended that the owners of the working interest had "washed out" their interests by allowing "the lease to expire;" they asserted that the holder of a new lease, who had bought the leasehold equipment from the working interest owners, was bound to honor their overriding royalty interests. 593 S.W.2d 729, 729 (Tex. Civ. App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.). The overriding royalty interest holders were protected by renewals and extensions clauses in their assignments, but this Court noted that it was undisputed that the original leases had

expired at the time the new leaseholder had acquired the leasehold and equipment. *Id.* at 731. We held that the new leaseholder was not obligated to honor the overriding royalty interests. *Id.*

In *Wagner v. Sheets & Walton Drilling Company*, the court considered whether an overriding royalty interest that burdened an original lease should be "equitably impress[ed]" on a new lease covering the same land. 359 S.W.2d 543, 544–45 (Tex. Civ. App.—Eastland 1962, writ ref'd n.r.e.). The original lease provided that it expired in the absence of production at the end of the primary term. *Id.* at 545. Moreover, the "continuation of the overriding royalty" in the original lease "depended upon the continuation of the lease;" there was no provision requiring that the lease be maintained beyond its primary term, and there were no provisions in the assignments providing that the overriding royalties would be continued in any new leases on the same property. *Id.* The lessee had permitted the original lease to expire and had re-leased (almost all of) the same land, but the court stated that the lessee had done "no more than that which [it] had the right to do under the [original] lease and the assignments." *Id.* at 545–46. Concluding that the original lease had expired by its own terms and the new lease was not an "extension" of the prior lease, the court explained,

> True, it would have been greatly to the advantage of the holders of the overriding royalty interest for the [original] lease to be perpetuated in toto or that such overriding royalty be continued in effect as to all lands covered by such lease in any new lease agreement. The holders

25

of the [original] lease, however, had no such obligation. There was no fiduciary relationship between the parties which required the holders of that lease to maintain it or the overriding royalty interest of appellant in force as to all the land involved therein.

*Id*. at 546. Thus, the court held that there was no basis on which to impress the new lease with the overriding royalty that burdened the original lease. *Id*.

In *Fain & McGaha v. Biesel*, the holder of overriding royalty interests contended that their interests should be applied to the portion of the lease that had been voluntarily surrendered and any new leaseholders obtaining a lease from the mineral owners should have to take the lease "burdened by the same obligation." 331 S.W.2d 346, 347–48 (Tex. Civ. App.—Fort Worth 1960, writ ref'd n.r.e.). Noting that the original lease permitted the lessee to surrender the lease at any time, the court explained,

> *[U]nless the instrument creating the overriding or royalty interest as an estate in itself makes express provision to the contrary*, the interest continues or ceases with the leasehold estate out of which it is carved and cannot survive termination by surrender or release of the leasehold estate by the owners.

*Id*. at 348 (emphasis added).

Finally, we consider two cases from the Unites States Court of Appeals for the Fifth Circuit. In *Keese v. Continental Pipe Line Company*, holders of overriding royalty interests in an original lease that had been surrendered by the lessee contended that their interests should be applied to a new lease. 235 F.2d 386, 387–80 (5th Cir. 1956). The court stated that "unless . . . the instrument

26

creating the overriding or royalty interest makes express provision to the contrary, the interest continues or ceases with the leasehold estate out of which it is carved and cannot survive termination by surrender or release of the leasehold estate by the owners." *Id.* at 388. In addressing the plaintiffs' arguments that lessee had surrendered the lease in bad faith, the court explained,

> Assuming, without deciding, that the surrender to the mineral owners by the holders of the leasehold estate could, under any state of facts, operate to give the owners of the override an interest in oil produced not under the lease from which the override was carved but under a new one issued by the mineral owners to a different lessee, *though in the state of the authorities affirming the right of the lessee to do just that, it is difficult to assume any state of facts which could do so,* it is quite clear that no such facts or circumstances are presented or pointed to by plaintiffs.

*Id.* at 388 (emphasis added). The court concluded that the "remote assignees in the leasehold chain of title[] were under no obligation to plaintiffs to drill or to continue to hold on to the lease," and the fact that the assignee "knew or might have known that a good well could be brought in on the property, could not have prevented them from surrendering the lease to the landowners *for any reason or for no reason at all.*" *Id.* at 389 (emphasis added). The court explained that "[t]he exercise by one man of a legal right cannot be a legal wrong to another" and "whatever one has a right to do, another cannot have a right to complain." [11] *Id.*

---

[11] The court further stated,

(quoting *Montgomery v. Phillips Petroleum Co.*, 49 S.W.2d 967, 971 (Tex. Civ. App.—Amarillo 1932, writ ref'd)).

In *In re GHR Energy Corp.*, the court considered an overriding royalty agreement that included a renewals or extensions clause but also provided that preservation of the lease was "solely at the will [of the lessee]." 972 F.2d 96, 99 (5th Cir. 1992). Even though production never ceased, the lessee terminated the lease and entered into new leases, thereby extinguishing the overriding royalty owner's interest in the original lease. *Id.* The court held that the lessee "was free to terminate the leasehold estate" and "cut off" the overriding royalties pursuant to the lease's surrender clause, despite the fact that gas production never ceased. *Id.* at 100. However, on rehearing, the court noted, "We might well reach a different result if the facts here had suggested that [the lessee] surrendered its interest in the

> Ordinarily, an assignment of a lease where assignor retains an overriding royalty interest without further provision does not create a fiduciary relationship between the assignor and assignee.
>
> . . . .
>
> The obligations of the payor or grantor of the oil payment, unless otherwise modified, go no further than those contained in his contract with the payee, and the rights and privileges of lessee under the lease may be exercised without liability to the holder of the oil payment. Thus, he may allow the lease to terminate under its terms for nonpayment of delay rentals or by surrender of the lease or by failure to drill.

*Keese v. Cont'l Pipe Line Co.*, 235 F.2d 386, 388 (5th Cir. 1956) (citations omitted).

lease *to destroy* the rights of the overriding royalty interest owner." *In re GHR Energy Corp.*, 979 F.2d at 41 (emphasis added).

In sum, no Texas court has yet recognized that a lessee generally owes any type of duty, whether it be an implied contractual covenant or a fiduciary-type duty, to protect the interest of an overriding royalty interest holder so as to require the lessee to make repairs to well equipment, perpetuate the lease, and ensure that such overriding interests are not extinguished. As explained above, the Texas Supreme Court's opinions in *Sunac* and *Ridge Oil Company*, and the authority from Texas courts of appeals, indicate that we must consider the language of controlling documents and the circumstances and relationships of the parties to determine whether the Stroud defendants have committed an actionable wrong against appellees by allowing the B&G leases to expire with one of their intended purposes being to extinguish appellees' interests.

Here, other than the fact that appellees held overriding royalty interests in the B&G leases, there is no evidence of any special relationship of trust and confidence between appellees and Plantation. *See Sunac*, 416 S.W.2d at 804 (stating that "generally, . . . the assignment of an oil and gas lease reserving an overriding royalty in the assignor does not usually create any confidential or fiduciary relationship between the assignor and his assignee"). Appellees acquired their overriding royalty interests in the B&G leases in the late 1970s. Plantation

29

did not acquire its working interest in the B&G leases until December 2003. And appellees did not present any evidence upon which a court might find the existence of a fiduciary or confidential relationship. *See Exploration Co.*, 843 S.W.2d at 126–27 ("Other than the typical cases of fiduciary relationship, such as attorney-client, partners, close family relationships, and joint adventurers, a fiduciary relationship can arise if, over a long period of time, the parties have worked together in the joint acquisition and development of property before entering the agreement sought to be enforced.").

Turning to the specific language of the controlling documents, the assignments granting appellees their overriding royalty interests did not contain any renewals or extensions clauses. Texas courts have recognized that these types of clauses may provide some evidence of a fiduciary relationship or support a constructive-trust remedy. *See Sunac*, 416 S.W.2d at 804 ("The language most often pointed to by the courts as creating a fiduciary relation in this type of situation provides that the overriding royalty will apply to any extensions or renewals of the lease assigned."). However, Texas courts have also held that, even when this "phraseology" is present, a special or confidential relationship or duty may still be lacking. *See id.* (construing renewals and extension clause and surrender clause in lease together, and noting that lessee had no duty to continue lease in force but rather could surrender the lease at any time without consent of

30

overriding royalty interest holders); *Exploration Co.*, 843 S.W.2d at 124, 126 (declining to impose fiduciary duty on lessee despite fact that assignment contained renewals and extensions clause and lease did not contain surrender clause). Here, Hosford admitted that the failure to include renewals and extensions language in his assignment was a "mistake."

We recognize that the B&G leases do not contain express surrender clauses, and many courts that have declined relief to holders of overriding royalty interests, whether it be through a constructive trust or a claim based upon a fiduciary-type duty, have placed significant weight upon the nonexistence of such surrender clauses in leases and assignments. However, at least one court has stated that the absence of a surrender clause, even when there is also a renewals and extensions clause, does not result in the creation of a fiduciary relationship. *See Exploration Co.*, 843 S.W.2d at 124, 126. Based upon our review of Texas case law, we cannot say that the absence of a surrender clause in this case indicates the existence of some sort of special duty owed to appellees.

It is undisputed that the B&G leases terminated following 90 days of non-production. After production ceased, and during the 90-day continuous-operation period, the Stroud defendants obtained a new lease from Bowers. And they subsequently obtained a new lease from Gordon. Although the royalty structure remained the same, these new leases contained terms that materially differed from

31

the B&G leases. And, although there were no surrender clauses in the B&G leases, appellees have not cited anything in the assignments of the overriding royalty interests or the B&G leases that obligated the Stroud defendants to repair the polished rod on the broken well or take other action to perpetuate the B&G leases. Appellees have also not cited any contractual provision that would have precluded the lessee and the lessors from entering into new leases.[12] Moreover, appellees have not cited any case law suggesting that any sort of implied covenant in an oil and gas lease supports their cause of action. Finally, we note that, at the end of trial, appellees conceded that they had not developed any claim based upon an implied duty to develop the B&G leases, and the trial court granted a directed verdict on this claim. Appellees have not appealed that portion of the judgment.

We recognize that the Texas Supreme Court, in *Ridge Oil*, and the Fifth Circuit, in *In re GHR Energy Corp.*, have at least suggested the possibility that a party that engages in conduct to intentionally wash-out an overriding royalty interest may be subject to liability. However, based upon the evidence before us, we cannot say the Stroud defendants committed an actionable wrong by intentionally terminating the B&G leases to extinguish the overriding royalty

---

[12] The trial court granted a directed verdict on appellees' claims arising from an alleged duty of good faith and fair dealing and a duty to develop the leasehold. Appellees have not challenged those rulings. They have also not argued to this Court that the Stroud defendants breached any sort of implied covenant or duty, which flowed to them, to develop the leasehold estate.

32

interests and acquiring new leases with the lessors. *See Keese*, 235 F.2d at 388 (stating that "[t]he exercise by one man of a legal right cannot be a legal wrong to another" and about "whatever one has a right to do, another cannot have a right to complain"). *Id*. Because there is no evidence that the Stroud defendants violated any express or implied contractual duty and there is no evidence of the existence of a fiduciary or confidential relationship, we hold that the trial court erred in entering judgment against the Stroud defendants based upon appellees' claim that they intentionally terminated the B&G leases to destroy appelles' overriding royalty interests.

We sustain the Stroud defendants' first issue.

## Conversion

In their third issue, the Stroud defendants argue that the trial court erred in entering judgment in favor of appellees based upon their conversion claim because this claim was "for contract damages," is "barred by the economic loss doctrine," and is based upon a "general debt satisfied by the payment of money." The Stroud defendants further argue that appellees' conversion claim is not supported by sufficient evidence because appellees received all the royalties they were due and had no interest in production from the McNeil leases.

The elements of a conversion claim are (1) the plaintiff owned or had possession of the property or entitlement to possession; (2) the defendant

33

unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property. *Khorshid, Inc. v. Christian*, 257 S.W.3d 748, 759 (Tex. App.—Dallas 2008, no pet.).

The trial court asked the jury whether Plantation had converted appellees' proceeds from their overriding royalty interests on the B&G leases. It instructed the jury that Plantation could be liable for conversion if it exercised dominion or control over the personal property of another without consent of the owner and to the exclusion of the owner's right of possession and use. As we have held above, appellees were not legally entitled to recover overriding royalties after the termination of the B&G leases. Accordingly, we hold that the trial court erred in entering judgment in favor of appellees based upon their conversion claim for "unpaid royalties" after the B&G leases had expired.

As to the question of payment for overriding royalties due from January 2004, we have held that the evidence is legally sufficient to support the jury's finding that Plantation failed to comply with its contended obligation to pay appellees these royalties. Because we affirm the jury's liability finding on appellees' breach-of-contract claim related to the January 2004 royalties, we need

not address whether liability for this portion of the judgment may also be sustained upon a conversion theory.

We sustain the Stroud defendants' third issue.

**Tortious Interference**

In their fourth issue, the Stroud defendants argue that the trial court erred in entering judgment in favor of appellees based upon their tortious-interference claim because Plantation "never objected to the actions of its agent Stroud Production," "the collapse" of the existing well on the B&G leases "cannot be attributed to Stroud Production," and there is no evidence that the Stroud defendants "sabotaged" the well. The Stroud defendants assert that "although Stroud Production did not repair the well after its collapse, tortious interference requires a willful act."

Appellees argue that Stroud Production "made decisions about the lease" and interfered with its "contractual relationship" with Plantation by washing out their overriding royalty interests. Appellees assert that the jury could have found that the failure of the only well that was sustaining the B&G leases was not "coincidental" and Stroud Production, as the operator, "willfully and intentionally interfered with [their] overriding royalty interests."

The trial court asked the jury whether Stroud Production had intentionally interfered with appellees' rights, if any, to receive overriding royalties under the

35

B&G leases.  The jury found that it had.  Again, as we have held above, appellees were not legally entitled to recover overriding royalties once the B&G leases terminated.  At the time the B&G leases terminated, Plantation was the lessee. Stroud admitted that he was the decision maker for both Stroud Production and Plantation, but appellees have not cited any evidence that Stroud Production, as operator, was actually the party that may legally be charged with allowing the B&G leases to expire.  In fact, appellees' "intentional termination" claim was brought against Plantation, not Stroud Production.  Thus, even if such conduct was actionable, and we have held that it was not, Plantation would be the liable party for intentionally terminating the lease.  Accordingly, we hold that the trial court erred in entering judgment in favor of appellees based upon their tortious-interference claim.

We sustain the Stroud defendants' fourth issue.

### Alter Ego

In their fifth issue, the Stroud defendants argue that appellees' "alter ego claims are barred because the trial court granted summary judgment on all fraud claims."  In their tenth issue, the Stroud defendants argue that the jury's alter ego findings "fatally conflict" with the jury's tortious-interference and conspiracy findings because a party "cannot interfere with its own contract" and the jury's alter ego findings establish that "there are no separate entities capable of tortiously

36

interfering with Plantation's contract or conspiring together to convert overriding royalty interest payments."

The trial court asked the jury whether Stroud was responsible for the conduct of Plantation, and it instructed the jury that he was if he used Plantation "for the purpose of perpetrating and did perpetrate an actual fraud on [appellees] primarily for the direct personal benefit" of himself. The jury found that Stroud was responsible for the conduct of Plantation. The trial court also asked the jury whether Stroud was responsible for the conduct of Stroud Production, and it instructed the jury that he was responsible if Stroud Production was organized as a mere tool or business conduit of Stroud, there was such unity of purpose between Stroud and Stroud Production that the separateness of Stroud Production ceased, and holding only Stroud Production liable would result in injustice. The jury also found that Stroud was responsible for the conduct of Stroud Production.

We have previously held that all underlying causes of action against Stroud Production fail as a matter of law. Accordingly, there is no basis on which to hold Stroud responsible for the conduct of Stroud Production. We have also previously held that all underlying causes of action against Plantation, except for the breach-of-contract claim pertaining to appellees' overriding royalties on production from the B&G leases for January 2004, fail a matter of law. In regard to the remaining issues, having held that Plantation did not commit an actionable wrong under

Texas law by intentionally terminating the B&G leases to destroy appellees' interests, we further hold that there is no basis upon which to sustain an alter ego finding against Stroud individually. Accordingly, we need not address the Stroud defendants' fifth and tenth issues.

## Conspiracy

In their sixth issue, the Stroud defendants argue that the trial court erred in entering judgment in favor of appellees based on their conspiracy claims because appellees "other causes of action fail." We agree and hold that appellees' are not entitled to judgment against the Stroud defendants based upon a conspiracy claim.

We sustain the Stroud defendants' sixth issue.

## Prejudgment Interest

In their seventh issue, the Stroud defendants argue that the trial court erred in awarding appellees prejudgment interest because appellees' underlying causes of action fail and, even if there is a valid claim, appellees "calculated interest using the wrong date." Specifically, the Stroud defendants complain that it was error to use July 2005 as the date to begin to calculate prejudgment interest for each appellee because a July 2005 demand letter, upon which the award of prejudgment interest was based, referred only to Hosford individually and not the other appellees.

We have concluded that the only claim upon which appellees are entitled to recover is their breach-of-contract claim pertaining to Plantation's failure to timely pay their overriding royalties on production from the B&G leases for January 2004. Accordingly, we hold that the trial court erred in its award of prejudgment interest to appellees. In light of the fact that we are reversing the overwhelming majority of the damages awarded to appellees, we remand the case for a recalculation of prejudgment interest.

We sustain the Stroud defendants' seventh issue.

### Attorney's Fees

In their ninth issue, the Stroud defendants argue that the trial court erred in awarding appellees their attorney's fees because their claim for "intentional termination" is not a claim based in contract and such a claim, if it existed, would be a tort claim for which attorney's fees are not recoverable. The Stroud defendants further argue that the trial court erred in awarding appellees their attorney's fees because it applied "the wrong segregation-of-fees" standard and that award is not "sufficiently definite." In their eleventh issue, the Stroud defendants argue that the trial court's judgment is not "sufficiently definite because it suggests a quadruple recovery of attorney's fees."

The trial court's award of attorney's fees includes fees related to appellees' claim for "intentional termination." "[I]f any attorney's fees relate solely to a

39

claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S .W.3d 299, 313 (Tex. 2006). Having held that the only claim on which appellees were entitled to recover was their breach-of-contract claim, we further hold that the trial court erred in its award of attorney's fees to appellees, and we remand the issue of attorney's fees to the trial court for a new trial on the issue.

We sustain the Stroud defendants' ninth and eleventh issues.

## Evidentiary Issues

In their twelfth issue, the Stroud defendants argue that they are entitled to a new trial because the trial court committed a number of errors in making various evidentiary rulings. None of these issues concern the jury findings on appellees' claim for breach of contract pertaining to their overriding royalties on production from the B&G leases for January 2004. In light of our other holdings, which require a remand of this case for a recalculation of prejudgment interest and a new trial solely on the issue of attorney's fees, we need not address the Stroud defendants' twelfth issue.

## Conclusion

Having overruled the Stroud defendants' eighth issue and sustained their first issue, we need not address their second issue concerning damages.

We reverse and render judgment in favor of the Stroud defendants on all claims brought by appellees except for their breach-of-contract claim pertaining to their overriding royalties on production from the B&G leases for January 2004. We remand for a new trial on the issue of attorney's fees and a recalculation of prejudgment interest.


Terry Jennings
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes

Justice Keyes dissenting.